**James H. CURRAN, Petitioner,**

v.

**DEPARTMENT OF THE TREASURY, Respondent.**

**No. 82–7367.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 8, 1983.

Decided Aug. 30, 1983.

As Modified Nov. 7, 1983.

Andrew R. Krakoff, Assoc. Gen. Counsel, San Francisco, Cal., for petitioner.

Sandra Willis, Asst. U.S. Atty., San Francisco, Cal., for respondent.

Before HUG, POOLE and NORRIS, Circuit Judges.

HUG, Circuit Judge:

James Curran was removed from his position as a special agent for the United States Customs Service when he refused to comply with an involuntary lateral transfer order. After a hearing before an administrative law judge of the Merit Systems Protection Board ("MSPB"), the agency was ordered to reinstate Curran. However, the MSPB reversed its ALJ's decision, concluding the agency's action was based on legitimate management considerations. In reviewing the MSPB decision, we must consider the relationship between the full board and the ALJ and how that relationship affects our substantial evidence determination. *See* 5 U.S.C. § 7703(c).

Before the MSPB, it is the agency's burden to establish that the adverse action "promote[d] the efficiency of the service." 5 U.S.C. §§ 7701(c) and 7513(a). This requires proof of a rational nexus between the adverse action taken and the agency's articulated reason for the action. *D.E. v.*

*Dept. of the Navy, MSPB,* 707 F.2d 1049, 1050 (9th Cir.1983); *see Hoska v. Dept. of Army,* 677 F.2d 131, 136–37 (D.C.Cir.1982); *Bonet v. Postal Service,* 661 F.2d 1071, 1074–75 (5th Cir.1981). Where the removal is based on a refusal to accept reassignment, the MSPB has required the agency to show that the reassignment was based on a "legitimate management consideration." *Ketterer v. Dept. of Agriculture,* 2 MSPB 459, 461 (1980); *see also McClelland v. Andrus,* 606 F.2d 1278, 1290–91 (D.C.Cir.1979). The employee may then rebut that showing with evidence that the asserted consideration is pretextual. *Ketterer,* 2 MSPB at 462.

■ An appeal may be heard by the full board or referred to an ALJ. 5 U.S.C. § 7701(b). This provision assures the employee a "full evidentiary hearing in any case where there is a dispute as to any genuine and material issue of fact ...." S.Rep. No. 969, 95th Cong., 2d Sess. 54, *reprinted in* 1978 U.S.Code Cong. & Ad. News 2723, 2776. Reference of the case to an ALJ is therefore proper in cases "which may be most appropriately considered and resolved through the traditional adjudicatory methods used in evidentiary hearings. This would include instances, for example, where oral testimony and cross-examination is the best way to test the credibility of the witnesses." *Id.*

■ Under section 7701(e), the ALJ's decision becomes the final order of the MSPB unless it is appealed to the full board. In reviewing an appealed case, the board is entitled to substitute its judgment for that of the ALJ. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 492, 71 S.Ct. 456, 467, 95 L.Ed. 456 (1951); *McDonough v. Postal Service,* 666 F.2d 647, 648 n. 1 (1st Cir.1981). However, on review by this court, the findings supporting the ALJ's judgment constitute a part of the record we review. *See Universal Camera,* 340 U.S. at 492–97, 71 S.Ct. at 467–69; *Penasquitos Village, Inc. v. NLRB,* 565 F.2d 1074, 1076 (9th Cir.1977). The fact that the findings of the ALJ differ from those of the full board does not alter the requirement that we af-

firm MSPB decisions if supported by substantial evidence. *See Tenorio v. NLRB,* 680 F.2d 598, 601 (9th Cir.1982); 5 U.S.C. § 7703(c). However, consideration of the ALJ's findings will require a more searching scrutiny of the record. *See Doug Hartley, Inc. v. NLRB,* 669 F.2d 579, 581 (9th Cir.1982); *Penasquitos Village,* 565 F.2d at 1078. Special deference is to be given the ALJ's credibility judgments. *See id.* A finding of the full board that rests solely on testimony discredited by the ALJ is not supported by substantial evidence and cannot be sustained. *See Kallmann v. NLRB,* 640 F.2d 1094, 1098 n. 7 (9th Cir.1981); *Loomis Courier Service, Inc. v. NLRB,* 595 F.2d 491, 496 (9th Cir.1979).

The evidence developed at the hearing before the ALJ showed that Curran was a special agent in the Seattle field office of the Customs Service. He was most frequently assigned to criminal fraud investigations. It was agreed that Curran was one of the office's most able agents. He was productive, performed his job well, and consistently received satisfactory performance ratings. Problems had developed, however, within the Seattle field office, which had organizational and performance weaknesses. In January 1979, Thomas Boyd, the agency's deputy regional director, visited the Seattle office to investigate these problems and meet with the agents. He reviewed Curran's cases with him and discussed the agent's future. Curran told Boyd he was interested in an overseas assignment, but would not want to be transferred to San Francisco or Los Angeles. He explained that such a transfer would impose hardships on his family.

In April 1979, the agency transferred a new special agent in charge to Seattle in an attempt to remedy the performance problems of the office. That agent, Linwood Rountree, told the Seattle employees that agents not performing to his standards would be transferred or removed from the Customs Service.

The parties agree that personal and policy conflicts between Rountree and Curran developed almost immediately. The con-

flict led to an incident on August 17, 1979, in which Curran and Rountree disputed shift assignments for a surveillance operation. Curran and his supervisor suggested the surveillance could best be handled by 24-hour shifts. Rountree rejected that recommendation and ordered 12-hour shifts. Curran requested that he not be assigned to a particular Sunday shift because of a personal commitment; when Rountree refused, the discussion became heated. Rountree assigned Curran to three 12-hour shifts. No other agent was assigned more than two shifts, and agents who volunteered to serve Curran's Sunday shift were refused. Curran told Rountree he planned to file a grievance regarding the shift assignments and would request overtime compensation.

In October 1979, Curran received notice that he was being transferred to the San Francisco field office. He had neither applied for the transfer nor been consulted. Curran was convinced the transfer would threaten his family's financial security, interfere with his wife's employment, and prevent his completion of a graduate degree program. He therefore refused the transfer and filed an administrative appeal. He claimed the decision to transfer him did not result from legitimate administrative concerns. He believed it was caused by his conflict with Rountree and was triggered by the August 17 incident.

The Department of the Treasury refused to reverse the transfer order. On April 4, 1980, Curran was ordered to report for duty in San Francisco on the following Monday, April 7. He failed to appear and was consequently removed from service on September 6, 1980.

Curran appealed his removal to the MSPB, which ordered a hearing before an ALJ. Boyd, testifying for the agency, contended two management decisions led to the transfer order. First, it had been concluded that Curran was "a very intelligent young agent with a lot of potential." Because more complex fraud cases arose in San Francisco than in Seattle, the transfer would enable Curran to develop his potential. Second, the organizational and per-

formance problems in Seattle required an exchange of agents between Seattle and San Francisco. Curran's transfer permitted the assignment to Seattle of two more experienced and better qualified agents. Boyd testified that his decision to transfer Curran predated Rountree's arrival in Seattle.

Curran's witnesses rebutted Boyd's contentions. Their evidence showed that involuntary lateral transfers were unprecedented. Although Curran had not been told of the opportunity to develop his potential in San Francisco or asked if he were willing to transfer, both of the agents transferred into Seattle in exchange for Curran had done so voluntarily. The agency did not have a policy of rotating agents between field offices.

Dennis Palmer, an agent who had served in both San Francisco and Seattle, disputed the contention that more complex fraud cases arose in San Francisco. He testified that there was no specific fraud program in San Francisco and that because of Seattle's port, airport, and proximity to the border, complex cases did arise there. It was thus his opinion that Curran's potential could have been fully developed in Seattle.

Darryl Archer, Curran's supervising agent in Seattle, described the animosity between Rountree and Curran. He testified to statements by Rountree that Curran was "divisive" and should be removed from the service. He quoted Rountree as stating immediately after the August 17 incident that he had "taken care of" Curran by arranging for his transfer. Archer stated that as special agent in charge, Rountree would have "a lot of input" into any transfer decision.

In rebuttal, Rountree claimed Archer lied in describing his conflict with Curran and denied he had a problem with Curran. He stated he recommended Curran's transfer "sometime after August 17," but denied the recommendation was based on the incident on that date.

The ALJ concluded the agency had not proved by a preponderance of the evidence that Curran's transfer was based on legiti-

mate management reasons. She found the agency's claim that the transfer was required to develop Curran's potential was not supported by the evidence, specifically noting that no one asked Curran if he wanted the benefit of that development. She credited the testimony of Archer and Palmer that Seattle offered development potential equivalent to that in San Francisco, implicitly rejecting Boyd's testimony to the contrary. She found the agency had no past practice of involuntary transfers, and that all other agents involved in this case had consented to reassignment. She expressly credited Archer and Curran's description of the conflict with Rountree and believed that Rountree had made remarks adverse to Curran. She found that the transfer was not required by new programs or staffing imbalances, and that transferring agents into Seattle did not require Curran's reassignment. Finally, the ALJ noted that the "Customs Service Geographic Mobility Policy provides that consideration will be given to the needs and circumstances of employees when a reassignment is made," and that the policy prohibits retaliatory transfers.

The agency appealed to the MSPB, which reinstated the agency action, stating the ALJ had "erred in assessing the weight of the evidence." The MSPB concluded that a legitimate reason for the transfer did exist, based on three factors: (1) the agency established that employee exchanges between San Francisco and Seattle were needed to strengthen the Seattle office; (2) the agency established that Curran's transfer was necessary to develop his potential; and (3) the evidence showed the reassignment was not motivated by Curran's conflict with Rountree. We conclude that none of these findings is supported by substantial evidence.

The first finding—that employee exchanges were necessary—rests on Boyd's testimony that he ordered the three transfers to improve performance in the Seattle office and establish a viable fraud program there. However, there was no evidence that it was necessary to transfer an agent

out of Seattle in order to transfer others in. Boyd specifically testified that he was not trying to fill a position in San Francisco. The agency thus did not establish a nexus between Curran's transfer and the assignment of agents to Seattle. Nor did it explain why, assuming it was necessary to create a slot for the incoming agents, the transfer to San Francisco was not made available to all qualified agents on a voluntary basis. In view of Curran's acknowledged productivity and performance, he seems an unlikely choice to transfer from a failing office.

The second finding—that the transfer would enhance Curran's potential—rests entirely on Boyd's opinion that San Francisco provided a substantially superior employment opportunity. The ALJ discredited that testimony, noting it was contradicted by Archer and Palmer's testimony that Seattle did offer complex fraud cases that would adequately develop Curran's expertise. The MSPB failed to consider that, in contravention of its usual practice, the agency did not give Curran the opportunity to volunteer for career development, did not advise him of his development potential prior to the transfer, and did not make the transfer available to other qualified agents throughout the Customs Service. No nexus was established between a competent employee's desire not to avail himself of a career opportunity and the determination to remove him from service.

In reaching its third finding—that Curran's conflict with Rountree was not the cause of the agency action—the MSPB specifically credited Rountree's statement to that effect, saying that Curran "has offered no evidence to the contrary." The record clearly did include such evidence: Archer's testimony that Rountree was determined to "take care of" Curran. The ALJ expressly credited that testimony and rejected Rountree's denial that he made the statements. In addition, improper motive could be inferred from the fact that the actual transfer recommendation immediately followed the August 17 incident, from the extent of

the conflict, and from Rountree's ability to influence transfer decisions.

■ An involuntary transfer seriously disrupts the lives of the employee and his family. Although an agency's authority to reassign its employees is not questioned here, transfers may not be ordered for improper purposes. *See McClelland,* 606 F.2d at 1291. Moreover, the employee is entitled to an accurate statement of the reasons for the transfer so that he can fairly pursue any procedural or practical remedies.

Substantial evidence does not support the MSPB's conclusion that Curran was transferred for legitimate management reasons, and the decision is therefore reversed. Curran is to be reinstated at the grade he held prior to his removal. We remand the case to the MSPB for consideration of Curran's claims for back pay and reinstatement of benefits. *See* 5 U.S.C. § 5596; *Hoska,* 677 F.2d at 145.

■ Curran also requests that we order reimbursement of his attorney's fees. As the court recognized in *Hoska,* the Back Pay Act, 5 U.S.C. § 5596(b)(1)(A)(ii), "is sufficiently broad to include attorney's fees for services rendered in administrative or judicial appeals undertaken by an employee to obtain correction of 'an unjustified or unwarranted personnel action.'" 694 F.2d 270 at 273 (D.C.Cir. 1982). Curran would appear to be entitled to "reasonable attorney's fees related to the personnel action," 5 U.S.C. § 5596(b)(1)(A)(ii), and on remand the MSPB shall consider his fee request under this section. The request for attorney's fees for this appeal may be renewed before this court after the MSPB has made its determination.

REVERSED and REMANDED.