USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 92-1816 GEORGE E. HAZEL, Plaintiff, Appellant, v. U.S. POSTMASTER GENERAL, Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Robert E. Keeton, U.S. District Judge] ___________________ ____________________ Before Selya, Circuit Judge, _____________ Feinberg,* Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Stephen E. Kiley with whom Kiley & Hazel was on brief for __________________ ______________ appellant. David G. Karro, Attorney, Appellate Division, United States ________________ Postal Service, with whom A. John Pappalardo, United States Attorney, ___________________ Gwen R. Tyre, Assistant United States Attorney, R. Andrew German, _____________ _________________ Chief Counsel, Appellate Division, and Cynthia J. Hallberlin, _______________________ Attorney, Appellate Division, United States Postal Service, were on brief for appellee. ____________________ October 14, 1993 ____________________ _____________________ *Of the Second Circuit, sitting by designation. FEINBERG, Senior Circuit Judge. Plaintiff George E. ____________________ Hazel appeals from a judgment of the United States District Court for the District of Massachusetts, Robert E. Keeton, J., granting a motion by defendant-appellee Anthony M. Frank, Postmaster General of the United States, for judgment on partial findings pursuant to Fed. R. Civ. Proc. 52(c). Hazel, a former postal employee, had alleged that the Postal Service violated his civil rights when it fired him in retaliation for providing legal advice to another postal employee in her sex and age discrimination claims against the Postal Service. For the reasons stated below, we affirm. Background __________ George Hazel joined the Postal Inspection Service in 1971. The events giving rise to this action began on August 27, 1984 when Hazel's immediate supervisor, John Cinotti, gave him a "very good" evaluation only to have the next higher supervisor, M. W. Ryan, change it to "good," with the explanation that Cinotti had not justified the "very good." Hazel thought Ryan was reacting to the fact that Hazel was representing an Inspection Service clerk who had charged Ryan with sex and age discrimination. Hazel thought his suspicions were confirmed on September 5, 1984, when Ryan told him he would be transferred from the Fraud Section, where 2 Hazel had been for 13 years, to the Audit Section -- despite the fact that he had no auditing or accounting background. Moreover, according to Hazel, audit assignments, unlike fraud assignments, are very undesirable. After learning of Ryan's intention to reassign him, Hazel contacted an Equal Employment Opportunity (EEO) counselor with respect to the alleged employment discrimination. Thereafter, Ryan sent written confirmation of the reassignment, and Hazel responded as follows: "Since I believe your written directive ... violates the law, I respectfully refuse to accept the reassignment." Ryan warned Hazel that his letter could "be considered evidence of refusal to obey a direct order" and gave Hazel an opportunity to obey by moving the reporting date back from October 15 to October 18, 1984. Instead of complying with the order, Hazel reported for firearms training on the 18th, had lunch with a friend and went home. The next day, Ryan asked Hazel if he intended to report for his new assignment, and Hazel did not answer the question. Ryan then handed him a letter putting him in an off-duty status. When Hazel protested this decision, Ryan replied: "[Y]our placement in an off-duty status ... will ... remain in effect until such time as you report for duty to your new assignment." Hazel testified that he never attempted to report to the new assignment after receiving that reply. 3 Finally, on October 22, 1984, Ryan charged Hazel with, and recommended removing him from the Postal Service for, insubordination. The Regional Chief Inspector accepted the recommendation, and in a letter to Hazel, dated November 8, 1984, stated: I find that the charge, insubordination, as stated in the notice of October 22, 1984, is fully supported by the evidence. You were directed by Mr. M.W. Ryan, Inspector in Charge, Boston Division, to report effective October 15, 1984 to Team Leader E.A. Jacobs for Job Assignment #40. On that date, you directed a letter to Mr. Ryan refusing to comply with his directive. . . . On October 16, 1984, you were again ordered to report to Job Assignment #40 no later than October 18, 1984. As of October 19, 1984, you had not reported as directed, so you were placed in a non-duty non-pay status. . . . The position of Postal Inspector requires the utmost individual loyalty, diligence and dedication in the undertaking of assigned duties as needs of the Service dictate. Accordingly, a supported charge of insubordination is an extremely serious and grave charge which will not be condoned or tolerated. The Chief Inspector removed Hazel from the Postal Service effective November 23, 1984. In response to another appeal by Hazel, the Chief Inspector stated: Your failure to obey a direct order from the Inspector in Charge is intolerable. This type 4 of conduct is disruptive and undermines the morale of the employees in the office. Additionally, it is not in keeping with the image and professional standards expected of a Postal Inspector. Based on the nature of this incident your placement in a non-duty non-pay status was necessary and appropriate. In January 1988, after exhausting his administrative and EEO remedies, Hazel filed this action. It came to trial in June 1992, almost eight years after Hazel's removal for insubordination. After three days of a bench trial, during which Hazel presented his case through the testimony of seven witnesses including himself, defendant Postmaster General moved for judgment on partial findings pursuant to Fed. R. Civ. Proc. 52(c). The district judge stated his findings of fact and conclusions of law in open court, granted the motion and entered judgment for defendant. This appeal followed. Discussion __________ Hazel's retaliation claim required him to show a violation of either 29 U.S.C. 623(d), which forbids discrimination against employees opposing age discrimination, or 42 U.S.C. 2000e-3(a), which forbids retaliation against employees opposing sex discrimination. Under either statute, Hazel's initial burden was to "establish a prima facie case ___________ sufficient to permit an inference of retaliatory motive." The 5 burden placed on a plaintiff at this stage "is not onerous." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 ________________________________ _______ (1981). To state a prima facie claim of retaliation under _____ _____ Title VII, the plaintiff must show: "[1] protected participation or opposition under Title VII known by the alleged retaliator; [2] an employment action or actions disadvantaging persons engaged in protected activities; and [3] a causal connection between the first two elements[,] that is [,] a retaliatory motive playing a part in the adverse employment actions." Petitti v. New England Tel. & Tel. Co., _______ ___________________________ 909 F.2d 28, 33 (1st Cir. 1990) (quoting Grant v. Bethlehem _____ _________ Steel Corp., 622 F.2d 43, 46 (2nd Cir. 1980)). ___________ Once the prima facie case is established, the burden _____ _____ of production, not persuasion, shifts to the defendant to articulate a plausible, legitimate, and nondiscriminatory justification for the employment decision. Petitti, 909 F.2d _______ at 31. Once the employer proffers such a justification, the McDonnell Douglas framework -- with its _________________ presumptions and burdens -- is no longer relevant....the defendant's "production" (whatever its persuasive effect) having been made, the trier of fact proceeds to decide the ultimate question....Thus, rejection of the defendant's proffered reasons will permit the trier of fact to ______ infer the ultimate fact...., [but] the plaintiff at all times bears the "ultimate burden of persuasion." St. Mary's Honor Center v. Hicks, 113 S. Ct. 2742, 2749 (1993) (emphasis in original) (citations omitted). 6 The issue of retaliatory motive in an employment discrimination case presents "a pure question of fact," and the trial court's determination is reviewed under the clearly erroneous standard. See Pullman-Standard v. Swint, 456 U.S. ___ ________________ _____ 273, 287-88 (1982). Under the clearly erroneous standard, the court's inference must be affirmed if it is "plausible." Cumpiano v. Banco Santander Puerto Rico, 902 F.2d 148, 152 ________ ___________________________ (1st Cir. 1990). Judge Keeton heard the testimony of seven witnesses including Hazel and, as the trier of fact, was entitled to draw his own reasonable inferences as to whether Hazel was fired for a retaliatory reason. In his dispositive ruling, the judge stated: I cannot find that the discharge was motivated by retaliation, or, to put it in language that parallels many of the precedents here, I cannot find that a retaliatory motive was a motivating factor of the discharge, even when assuming that the retaliatory motive was a motivating factor of the downgrading of the rating from very good to good and a motivating factor of the reassignment. The judge further said that the plaintiff was not discharged, even by the plaintiff's own proof, simply because of the protected activity but instead was discharged, by the plaintiff's own proof, because of insubordination ..., a refusal to accept orders and comply with them[.] [This] is documented and undisputed under the plaintiff's own evidence. 7 On review to this court, we cannot say that these findings of fact are clearly erroneous. To put it another way, Hazel's admission that he refused to report for work and the evidence that the Postal Service fired him for that very reason provided a "plausible" basis for the district court's finding that retaliation is not the most likely reason Hazel was fired. Hazel argues to us, as a procedural matter, that the district court should have limited itself to determining whether he proved a prima facie case and then ___________ waited to hear the Postmaster General's evidence and Hazel's rebuttal case. It is true that in this type of litigation courts generally wait until after a defendant has put on its case to pass on the sufficiency of its nondiscriminatory explanation. This is because nondiscriminatory explanations usually do not surface fully until the defendant's case. But here, Hazel, in his own case, introduced evidence that he was discharged for insubordination as well as evidence purporting to show that the insubordination charge was only a pretext for firing him. In this court, Hazel points to no further evidence that he was unable to present because the district court's procedure took him by surprise. (Indeed, Hazel apparently made no such claim in the district court). Hazel also argues to us that his refusal to work was an activity protected by the anti-retaliation 8 statutes. However, he cites no persuasive authority for the proposition that an employee claiming discrimination can on that basis absolutely refuse to work where his employer directs. On the contrary, the right to oppose discrimination is not a right to refuse to work on account of discrimination. We have held that a plaintiff goes "beyond the scope of protected opposition" when he "damages the basic goals and interests" of the employer, who has a "legitimate interest in seeing that its employees perform their work well." Hochstadt _________ v. Worcester Foundation for Experimental Biology, 545 F.2d _____________________________________________ 222, 233 (1st Cir. 1976). The district judge could accept, as he obviously did, the judgment of the Postal Service that "insubordination is an extremely serious and grave charge," that it is "disruptive and undermines the morale of the employees in the office," that it is "not in keeping with the image and professional standards expected of a Postal Inspector," and that, if proved, it should "not be condoned or tolerated." We are aware that the timing of Ryan's downgrading of Hazel's evaluation and the subsequent transfer have the smell of bureaucratic retaliation.1 Indeed, the district judge assumed that to be so. Moreover, we are not ____________________ 1 We are also aware, of course, that the Postmaster General did not present his case in the district court. 9 unsympathetic to Hazel's plight. After a successful career of 13 years in the Fraud Section, including responsibility for major criminal investigations, Hazel obviously regarded his reassignment to the Audit Section -- where his responsibilities would have included such routine and monotonous work as the adjustment of slip-and-fall cases up to $5,000 -- as demeaning. Perhaps Hazel is arguing that his refusal to work was not insubordination because he was constructively discharged when Ryan reassigned him. But Hazel could have taken the new job under protest while pursuing his remedies. This he failed to do. The humiliation Hazel may have felt in the new job is a far cry from the serious hardship in cases where we have found constructive discharge. See, e.g., Aviles-Martinez v. Monroig, 963 F.2d 2, 6 (1st Cir. ___ _______________ _______ 1992). Hazel relies on Curran v. Department of the ______ _________________ Treasury, 714 F.2d 913 (9th Cir. 1983), for the proposition ________ that an employee need not obey an improper order. The legal issue there was whether the mandate of 5 U.S.C. 7701(c) and 7513 compelled the Merit Systems Protection Board (the Board) to reinstate an employee who was removed for refusing to obey an improper order that caused serious hardship. Putting to one side the different remedial powers and obligations of the Board in that case and the federal district court here, Curran ______ is distinguishable. It is clear that the order that the 10 plaintiff there refused to obey -- that he transfer from Seattle to San Francisco -- would have imposed serious hardships on him that could not be made good by returning him a few years later at the end of administrative and legal proceedings. 714 F.2d at 918. The plaintiff apparently persuaded the court that "the transfer would threaten his family's financial security, interfere with his wife's employment, and prevent his completion of a graduate degree." 714 F.2d at 916. In contrast, Hazel's only concrete complaints about being assigned to the Audit Section were that audit assignments are boring (the work is "useless and repetitive") and involve overnight travel. Yet, the district court, as factfinder, was not even obliged to take this claim of inconvenience at face value, given Hazel's admission that another employee was given an assignment to the Audit Section because it would not require her to travel. ___ Finally, even if we assume, as did the trial court, that Hazel's reassignment and downgraded performance evaluation were the product of impermissible retaliation in contravention of Title VII, he cannot recover any damages because of his failure to mitigate by reporting to work in the new post. And, granting equitable relief would be equally futile. The failure to mitigate undercuts any claim for back pay. As for reinstatement, we realize that our dissenting brother suggests a remand so that the district court may 11 consider ordering that statutory remedy by reinstating plaintiff to his original "very good" rating and fraud inspector's job. But the able district judge has already considered this possibility by assuming that the demotion and transfer were both unlawful and by specifically considering whether plaintiff was entitled to "back pay or other remedies _________________ available under Title VII" (emphasis supplied). The judge _________________________ nevertheless chose not to grant any relief on the record before him. The judge certainly had discretion in this respect, see Rosario-Torres v. Hernandez-Colon, 889 F.2d 314, ______________ _______________ 320-22 (1st Cir. 1989) (en banc), and, on the record before us, we cannot say that he abused it. Under the circumstances, a remand would serve no useful purpose and we will therefore not order it. See Equitable Life Assurance Soc'y v. Porter- ___ ______________________________ _______ Englehart, 867 F.2d 79, 84 n.3 (1st Cir. 1989) (refusing the _________ remedy appellant sought as "utterly pointless" because it would leave her in no better position than she was during litigation). In sum, Hazel's proof was sufficient to justify the district judge's finding that Hazel was fired for refusing to report to work rather than for opposing discrimination. Under the circumstances, the district court was entitled to enter judgment for the Postmaster General at the close of Hazel's case. Accordingly, the judgment of the district court is Affirmed. ________ 12 STAHL, Circuit Judge, dissenting. Because I _____________ disagree with the majority's reading of the record, I would remand in order to give the district court the opportunity to consider restoration of plaintiff's "very good" rating and reinstatement of plaintiff to his fraud inspector's job. Given plaintiff's refusal to comply with a reassignment which he alleged to have been unlawful and in retaliation for protected behavior, the district court reasoned that it need not reach those issues. This decision of the district court was erroneous. Cf. Garcia v. Lawn, 805 F.2d 1400, 1401-02 ___ ______ ____ (9th Cir. 1986) (holding that district court was not without power to reinstate plaintiff even though plaintiff had been dismissed during the pendency of his case for failure to report to an allegedly unlawful reassignment). Accordingly, this case should be remanded for consideration of these claims and possible equitable relief under Title VII. 13