United States Court of Appeals United States Court of Appeals
For the First Circuit For the First Circuit


No. 95-2294

RACHEL L. FENNELL,

Plaintiff, Appellant,

v.

FIRST STEP DESIGNS, LTD, D/B/A HAND-IN-HAND,

Defendant, Appellee.



APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge] 



Before

Selya, Circuit Judge, 
Campbell, Senior Circuit Judge, 
and Stahl, Circuit Judge. 



Roy T. Pierce with whom Alfred C. Frawley and Brann & Isaacson 
were on brief for appellant.
Peter Bennett with whom Frederick B. Finberg and Bennett and 
Associates, P.A. were on brief for appellee. 



May 15, 1996


STAHL, Circuit Judge. Rachel L. Fennell sued her STAHL, Circuit Judge. 

former employer, First Step Designs, Ltd. ("First Step"),

under Title VII and related state laws, claiming that she was

terminated in retaliation for making allegations of sexual

harassment. First Step moved for summary judgment,

presenting evidence that the decision to lay off Fennell had

been made prior to her complaint. The district court granted

summary judgment for First Step, after denying Fennell's

motion for further discovery under Fed. R. Civ. P. 56(f).

Fennell had hoped that further discovery would uncover proof

in First Step's computer files that a memo about planned

layoffs, dated prior to her report of harassment, had been

fabricated. Fennell appeals both rulings. We affirm.

I. I. 

Background Background 

A. Factual Background: Fennell's Retaliation Claim 

First Step, a designer, manufacturer, and

distributor of play equipment for children, operates a

warehouse and customer service center in Oxford, Maine.

Fennell worked as a Warehouse Lead, a supervisory position in

which she directed the warehouse staff in fulfilling orders.

Although Fennell was a supervisor and shared office space

with the Warehouse Manager, she spent most of her time on the

warehouse floor working alongside the other warehouse

workers. Her immediate supervisor was Wayne Smith, the

-2- 2

Warehouse Manager. Kathleen Tucker, General Manager of the

warehouse, was Smith's supervisor.

1. Fennell's Report of Harassment and Her 

Subsequent Layoff 

Two First Step employees had complained to Fennell

about on-the-job sexual remarks by Smith, and Fennell had

heard from other employees about a sexually offensive remark

Smith had made while performing as a country musician at a

company-sponsored benefit dance. On November 19, 1993,

Fennell met with Tucker and recounted what she had heard

about Smith's inappropriate remarks. According to Fennell,

Tucker was hostile. Smith's immediate predecessor had been

fired in May of 1993 for sexual harassment, and Tucker was

incredulous to hear that First Step might have another

harasser as Warehouse Manager.

On December 20, 1993, Fennell was laid off,1 and

she believes her layoff was in retaliation for her complaints

to Tucker. Fennell also alleges that, after her report to

Tucker, she was given inferior work (regular packing duties

rather than supervisory duties). First Step maintains that

Fennell's layoff was planned before she complained to Tucker

about Smith, and that her complaint was not a factor in its

decision to lay her off.

 

1. Fennell asserts that she was terminated, while First Step
maintains she was only laid off. We address this dispute in
Part II.B.3, our discussion of the grant of summary judgment.

-3- 3

2. The October 25 Memo 

A memorandum dated October 25, 1993, from Tucker to

Eric Schultz, First Step's Boston-based Chief Operating

Officer, indicated that Fennell was scheduled for a layoff

the week before Christmas.2 The memo, titled "SUBJECT:

ANTICIPATED LAYOFFS/STAFFING," listed twenty-eight persons

and their continuing positions in the warehouse; it also

listed Fennell and four others under the subtitle "SCHEDULED

LAYOFFS WEEK OF CHRISTMAS." According to the affidavits of

Tucker and Schultz, the memorandum was a response to pressure

from Schultz to reduce operating costs at the warehouse.

Tucker and Schultz both state in their affidavits that the

memorandum was faxed to Schultz on October 25, and the

document bears a hand stamp indicating that it was faxed that

day. Brigitte Marston, a customer service supervisor also

reporting to Tucker, states in her affidavit that she saw a

"layoff list" with Fennell's name on it before Fennell's

November 19 meeting with Tucker. (Marston also attended that

meeting, at Fennell's request.) On November 5, 1993, Marston

sent an internal electronic mail message ("E-mail") to

another employee, in which she referred to the layoff list.

Marston implied in the E-mail that she had seen the list and

knew who was on it.

 

2. Copies of the memorandum have been made part of the
summary judgment record as exhibits to the affidavits of
Tucker and Schultz.

-4- 4

Fennell contends that the memorandum was fabricated

after the November 19 meeting. To support this contention, 

she points to five facts that, she argues, are suggestive of

fabrication: (1) one of the employees that Tucker listed for

an ongoing position in the October 25 memorandum had already

left the company late that summer, before the memo was

created; (2) Tucker stated that she had sent other memoranda

regarding earlier layoffs to Schultz, but neither she nor

Schultz kept copies of them (only the October 25 memo was

retained); (3) Tucker commented to Fennell earlier in October

1995 that she was doing a good job, that her services were

needed, and that she would not be required to cross-train as

a telemarketer; (4) First Step employees had inconsistently

described the job action taken with respect to Fennell

(sometimes as a layoff, other times as an elimination of her

position) as well as the precise reasons for the action; and

(5) certain other employees listed in the memorandum for

layoff were ultimately not laid off. For ease of reference,

we shall refer to these as "the five suspicious facts."

B. Prior Proceedings 

On January 23, 1995, Fennell filed a three-count

complaint in federal district court alleging that First Step

fired her in retaliation for her report of sexual harassment,

in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. 2000e-3(a), the Maine Human Rights Act, Me. Rev.

-5- 5

Stat. Ann. tit. 5, 4572(1)(E), and the Maine

Whistleblower's Protection Act, Me. Rev. Stat. Ann. tit. 26,

833(1)(A). On August 4, 1995, after the close of

discovery, First Step moved for summary judgment on all three

counts, arguing primarily that Fennell's layoff was planned

before she lodged her sexual harassment complaint, and thus

was not retaliatory. First Step asserted that there was no

genuine issue as to the fact that the layoff decision

predated Fennell's complaint, because the October 25 memo and

the corroborating testimony of three First Step managers was

essentially uncontroverted. On August 25, 1995, Fennell

opposed the motion, arguing that there was a genuine issue of

material fact as to whether the October 25 memo was actually

written before she complained to Tucker or whether it was,

instead, fabricated to exonerate First Step. In her

opposition to summary judgment, Fennell requested additional

time for discovery under Fed. R. Civ. P. 56(f) to determine,

based on the computer word processing file, when the memo was

written. On August 28, 1995, First Step responded by

providing a diskette containing a copy of the word processing

file of the October 25 memo. On September 9, 1995, First

Step submitted a reply brief and an objection to Fennell's

request for more discovery time, supported by an affidavit

averring that there was no way to determine from its computer

system when the document was first created.

-6- 6

The district court determined that, in light of the

October 25 memo, Fennell had not shown evidence sufficient to

allow a reasonable jury to find that her layoff was in

retaliation for her complaints about sexual harassment, and

it granted "conditional" summary judgment in favor of First

Step. The condition was that Fennell would have, under Rule

56(f), "seven (7) days in which to file any affidavit

revealing competent testimony, based on the magnetic medium

[i.e. the diskette containing the word processing file], that

the memorandum was created or modified (as opposed to being

simply called up) on or after November 19, 1993."3

Pursuant to the district court's order allowing

limited further discovery, Fennell submitted the affidavit of

her computer expert stating that the computer word processing

file containing the October 25 memo on a magnetic diskette

revealed that the document was "autodated"4 on August 7,

 

3. There is no dispute that the October 25, 1993, memo,
listing Fennell among those to be laid off, existed in May
1994, when it was submitted by First Step as part of the
Maine Human Rights Commission fact finding process. Thus, if
the document was fabricated as Fennell maintains, the
fabrication occurred sometime after November 19, 1993, and
before May 1994. 

4. Fennell's expert actually stated that the memo was
"modified" on August 7, 1995. However, the expert did not
suggest that there were any textual changes to the memo on 
that date. Rather, the expert referred to the automatic
modification of the date assigned to the document file by the
word processing program after certain commands have been
entered. For example, the expert stated, "if a file is
'called-up' to an application such as Wordperfect, and saved
to a different location (whether changed or not), the date of

-7- 7

1995. Fennell's expert proposed that the original date of

creation or date of any earlier modification could be

determined by a review of the file as it resided on First

Step's hard drive, rather than the diskette that had been

provided by First Step. The district court held a

hearing on Fennell's request for discovery of First Step's

hard drive and then directed the parties to submit a

"protocol" under which Fennell would have access to First

Step's hard drive. If no joint protocol could be agreed

upon, differences were to be resolved by conference.

Subsequently, the parties submitted substantially different

protocols.

After reviewing the protocols, and without holding

another conference, the district court decided that its

earlier decision to consider further discovery had been ill-

advised. Accordingly, the court denied any further Rule

56(f) discovery, and granted First Step summary judgment.

This appeal ensued.

II. II. 

Discussion Discussion 

 

saving is shown as the modification date." In an attempt to
achieve some clarity, we shall refer to such a change to the
date of a computer file not as a "modification," but as
"autodating." We consider "modification," as that term was
used by the district court, to mean a change in the text of
the document that would appear on a paper printout of the
document, as opposed to changes to the date assigned to the
computer file containing the document text. 

-8- 8

Fennell appeals the district court's grant of

summary judgment in favor of First Step, as well as its

denial of her request for additional discovery of First

Step's computer files in the hope that she might find

evidence that the October 25 memo was fabricated after the

fact. Because summary judgment would have been inappropriate

if Fennell had presented evidence that the memo was a

perjurious fabrication, we will address the discovery issue

first.

A. Denial of Rule 56(f) Discovery 

We review a district court's ruling on a discovery

request under Fed. R. Civ. P. 56(f) for abuse of discretion.

Price v. General Motors Corp., 931 F.2d 162, 164 (1st Cir. 

1991). Federal Rule of Civil Procedure 56(f) provides:

Should it appear from the affidavits of a
party opposing the [summary judgment]
motion that the party cannot for reasons
stated present by affidavit facts
essential to justify the party's
opposition, the court may refuse the
application for judgment or may order a
continuance to permit affidavits to be
obtained or depositions to be taken or
discovery to be had or may make such
other order as is just.

To receive the benefit of Rule 56(f), the "movant must (1)

articulate a plausible basis for the belief that discoverable

materials exist which would raise a trialworthy issue, and

(2) 'demonstrate good cause for failure to have conducted the

discovery earlier.'" Price, 931 F.2d at 164 (quoting 

-9- 9

Paterson-Leitch Co. v. Massachusetts Mun. Wholesale Elec. 

Co., 840 F.2d 985, 988 (1st Cir. 1988)). Although the 

district court did not use these precise words, it denied any

further Rule 56(f) discovery essentially because Fennell did

not articulate a plausible basis for the belief that

discoverable materials existed which would have raised a

trialworthy issue. For purposes of our analysis, we will

assume, but need not decide, that Fennell met the "good

cause" element.

Fennell argues that the district court should have

allowed Rule 56(f) discovery of First Step's hard drive

because her expert established that the October 25 memo was

"autodated" on August 7, 1995. Fennell argues that

regardless of whether the autodating was intentional or

inadvertent, it obscured the date of the document's last

prior modification or, if there was no prior modification,

the date of its creation, thus rendering those dates

uncertain. Fennell maintains that First Step must "live with

that uncertainty," by which she means that there is a genuine

dispute as to the date on which the memo was written.

Fennell emphasizes that First Step's summary judgment motion

is based in large part on the memo, as proof that the

business decision to lay off Fennell predated her report of

sexual harassment. Fennell also points to the "five

suspicious facts" noted earlier as support for her contention

-10- 10

that there is a plausible basis for her belief that further

discovery will yield evidence that the memo was fabricated.

We begin our analysis with a review of the discovery-related

proceedings below.

We note at the outset that First Step did not file

its motion for summary judgment until after the close of

discovery pursuant to the district court's pretrial order.

Fennell's original discovery request did not make clear

whether it called for a diskette copy of the memo or a paper

"original." In any event, there is no indication and no

allegation that First Step withheld the diskette from Fennell

in bad faith.

Despite the district court's determination that

Fennell's opposition to summary judgment had not demonstrated

any genuine dispute as to First Step's contention that its

decision to lay off Fennell preceded her complaint, the court

granted a seven-day extension to allow Fennell to file an

affidavit providing some computer-based evidence that the

memo was fabricated and antedated. By this time, a diskette

containing the memo's computer file was already in Fennell's

hands, thus the proposed extension did not involve any

intrusion or impose costs upon First Step.

In compliance with the discovery extension, Fennell

submitted the affidavit of her computer expert, which stated

that analysis of the diskette containing the word processing

-11- 11

file of the October 25 memo revealed that the document was

"autodated" on August 7, 1995. The district court determined

that the computer expert's affidavit did not reveal that the

memorandum was "created or modified (as opposed to being

simply called up) on or after November 19, 1993." In other

words, the affidavit was not probative of any fabrication.

Fennell's expert proposed that the original date of

creation or date of last textual modification could be

determined by review of the file as it resided on First

Step's hard drive. On the other hand, a First Step employee

had stated, in an affidavit previously filed in reply to

Fennell's opposition to summary judgment, that First Step's

computer consultant determined that its system could not

reveal the date on which the document was first created or

last textually modified.

The district court held a conference after Fennell

filed her computer expert's affidavit. After considering

Fennell's proposal that access to First Step's hard drive

might reveal the date of creation or modification of the

October 25 memo, the district court directed the parties to

submit a "protocol" establishing the procedures by which

Fennell would have access to relevant materials on First

Step's hard drive. The district court cautioned that

discovery would be allowed only if the protocol ensured that

hard drive access would have a "minimal degree of intrusion

-12- 12

time-wise and interference-wise" with First Step's

operations, and if it provided "adequate assurances of

confidentiality."

Fennell provided a protocol requiring a specialist

to "mirror" First Step's entire hard drive, and take the

mirror copy to its facility in Canada for complete analysis

and ultimate erasure.5 First Step objected to Fennell's

protocol and provided its own protocol.6

After reviewing the two protocols and apparently

recognizing that the parties were unlikely to reach

consensus, the district court concluded that its earlier

 

5. Fennell's protocol proposed, in sum: (1) a conference
call between the parties and their computer representatives
to discuss the computer system configuration; (2) an on-site
visit at First Step's warehouse where counsel would observe
Fennell's computer representative create a "mirror" of the
target hard drive; (3) an off-site analysis of the mirror
hard drive by a specialty laboratory, whereby the technicians
would attempt to determine the creation date or modification
date of the relevant files; (4) the erasure or destruction of
the mirror hard drive, certified by affidavit; and (5) a
protective order stipulating, in sum, that all information on
the mirror hard drive not relating to the creation,
modification, or erasure, of the relevant files is
confidential.

6. First Step objected to Fennell's protocol because, inter 
alia, it: (1) failed to describe the methodology by which 
the technicians would attempt to determine the creation or
modification dates (First Step noted that its computer system
contains many hard drives, and expressed concerns over
business risks resulting from accidental data loss,
incompatible hardware, and system downtime); (2) did not
adequately address attorney-client privilege and work product
concerns as to other documents on the hard drive; and (3)
allowed unsupervised possession of the mirror drive. The
district court described the detailed protocol that First
Step proposed as "extremely cumbersome and expensive."

-13- 13

decision to permit additional discovery had been "ill-

advised" because it would involve "a 'fishing expedition'

without any particularized likelihood of discovering

appropriate information," while, "[a]t the same time, the

process involves substantial risks and costs." To inform our

judgment whether the denial of further discovery was an abuse

of the district court's discretion, we first address the

district court's conclusion that the "risks and costs" were

substantial, and then its conclusion that the proposed

discovery was a "fishing expedition."

1. Risks and Costs 

A party seeking discovery under Rule 56(f) must

"articulate a plausible basis for the belief that

discoverable materials exist which would raise a trialworthy 

issue." Price, 931 F.2d at 164 (emphasis added). In 

determining whether material is "discoverable," the court

should consider not only whether the material actually

exists, but the burdens and expenses entailed in obtaining

the material. See Fed. R. Civ. P. 26(b)(2).7 Discovery 

 

7. Fed. R. Civ. P. 26(b)(2) provides:

The frequency or extent of use of the
discovery methods otherwise permitted
under these rules . . . shall be limited
by the court if it determines that: . . .
(iii) the burden or expense of the
proposed discovery outweighs its likely
benefit, taking into account the needs of
the case, the amount in controversy, the
parties' resources, the importance of the

-14- 14

matters are for the informed discretion of the district

court, and the breadth of that discretion in managing pre-

trial mechanics and discovery is very great. Fusco v. 

General Motors Corp., 11 F.3d 259, 267 (1st Cir. 1993). In 

exercising this broad discretion, the district court in this

case balanced the costs, burdens, and delays that the

proposed discovery entailed, as well as the likelihood of

discovering evidence of fabrication, against the obvious

importance of the evidence sought. See Resolution Trust v. 

North Bridge Assoc., 22 F.3d 1198, 1203 (1st Cir. 1994) 

(party seeking Rule 56(f) discovery "should set forth a

plausible basis for believing that specified facts,

susceptible of collection within a reasonable time frame, 

probably exist")(emphasis added).

The district court recognized First Step's concerns

over Fennell's insufficiently detailed description of the

proposed analysis of the hard drive,8 as well as the

confidentiality of information on the hard drive that was

proprietary or subject to attorney-client privilege or work-

 

issues at stake in the litigation, and
the importance of the proposed discovery
in resolving the issues.

8. First Step argued that Fennell's failure to disclose the
specific technical steps to be taken in the analysis of the
mirrored drive rendered her protocol nothing more than a
proposal for a fishing expedition. First Step also argued
that the unknown mirroring process and analysis of its system
might temporarily or permanently affect their computer system
and business operations.

-15- 15

product privilege. The district court also recognized that

resolving the discovery dispute, and the discovery process

itself, would increase legal and expert fees. The protocols

alerted the district court to genuine problems surrounding

the proposed discovery of First Step's hard drive. In

exercising its discretion, the district court reasonably

concluded that the discovery process would involve

substantial risks and costs. See id. 

2. A Fishing Expedition? 

The district court determined not only that the

risks and costs of further discovery were substantial, but

also that Fennell had not demonstrated "a particularized

likelihood of discovering appropriate information." We

agree. In our view, Fennell did not sufficiently "set forth

a plausible basis for believing that specified facts,

susceptible of collection within a reasonable time frame,

probably exist." Id. (party seeking discovery must show that 

it will not be an "exercise in futility").

As to "susceptibility of collection," all Fennell

was able to say was that "there may be a way." Fennell

submitted the affidavit of her expert, proposing that the

original date of creation or date of any earlier modification

of the October 25 memo could be determined by a review of the

memo file as it resided on First Step's hard drive, rather

than on the diskette originally provided by First Step.

-16- 16

First Step submitted a reply to Fennell's expert affidavit,

which argued that Fennell's expert's statements were

conclusory, without foundation, and that Fennell's

speculation and conjecture did not warrant additional

discovery. The district court then held a hearing on the

discovery issue, at which the following was stated:

[The Court:] It's my understanding
that based upon telephone communications
as recently as today, that [Fennell] is
informed by the [computer experts who
were to analyze the mirrored hard drive]
that they cannot reach a conclusion from
the disk that has been provided, but
instead, that the only way they can reach
any kind of conclusion is by access to
the hard drive on [First Step's]
premises. That at this time, they cannot
guarantee that there they can reach a
conclusive result, but that it's their
position there may be a way. Is that
essentially correct? 

[Counsel for Fennell:] That's
correct, Your Honor.

The lack of detail in Fennell's protocol cast even more doubt

on the soundness of the technical basis for the discovery

venture. The district court had good reason to be skeptical,

based on Fennell's inadequate showing that the proposed

analysis could determine the memo's creation date.

As to whether "specified facts . . . probably

exist," Fennell presented precious little that suggested that

fabrication had occurred. The "autodating" that occurred on

August 7, 1995, could not have indicated that the document

was fabricated on that day, as it had been submitted more

-17- 17

than a year earlier in the state proceedings. The

"autodating" could indicate an intentional conspiracy to

cover up the document's fabrication by obliterating the

actual creation date, but that is mere speculation. 

The "five suspicious facts," enumerated earlier,

are equally speculative. We fail to see how the inclusion of

an employee who had already left the company on the list of

employees to be retained makes fabrication more likely.

Fennell argues that the mistake indicates that the memo was

prepared at a later point in time, when Tucker's memory of

who was employed would have faded. That inference is, at

best, extremely attenuated.

The fact that the October 25 memo was retained

while other similar memos are no longer extant is also

virtually non-probative. It would be natural for an employer

to take care to retain a memo pertaining to an employee, soon

to be laid off, who had lodged a sexual harassment complaint.

Moreover, Fennell filed a state human rights charge within

ninety days of her complaint, thus the desirability of saving

any documents relating to her termination became obvious soon

after the memo was written. Nothing in the record suggests

any similar reasons for saving the earlier memos.

The fact that Tucker had made positive comments

about Fennell's performance and job security and First Step's

future shortly before she was placed on the layoff list is

-18- 18

not necessarily probative of fabrication, either. First Step

does not assert that Fennell was let go for poor performance,

but rather that her termination was part of a reorganization

dictated by financial concerns unrelated to her performance.

The need for her services until the end of the Christmas rush

could have been one reason Tucker spoke as she did.

Fennell claims that First Step managers

inconsistently described the nature of and the reasons for

the job action, but our review of all the statements shows no

sinister inconsistency. It appears that the term "layoff"

was used loosely, and was not necessarily indicative of a

temporary, rather than a permanent, action. And the various

statements about why she was let go, while worded in

different ways, all relate to First Step's business objective

of improving the economic efficiency of its warehouse

operation. We see nothing out-of-the-ordinary or suspicious

about the statements. 

Finally, the fact that some employees slated for

layoff in the memo were ultimately not laid off might say

something about the finality of the layoff list as a general

matter, but we fail to see how it suggests fabrication. It

is true that only two of the five individuals slated for

Christmas week layoffs were actually laid off as scheduled,

but the record indicates non-suspicious reasons for the

changes in First Step's plans. Two of the three who survived

-19- 19

the axe stayed on in telemarketing because two other

telemarketers requested layoffs. The other employee was out

with an injury collecting worker's compensation during

Christmas week; at the urging of First Step's insurer, she

was called back to light duty after the New Year and then

laid off shortly thereafter. And, even ignoring the

apparently legitimate reasons why some of the slated layoffs

did not occur, the changes in First Step's staffing plans do

not suggest fabrication. Why would a fabricated layoff list

be more likely to name employees eventually retained than a

real layoff list? Wouldn't a fabricated list, written after

the fact, have the benefit of hindsight and thus be more 

accurate? We see little probative value in this, or any of

the other "five suspicious facts."

3. Conclusion: No Abuse of Discretion 

Even if we were inclined to disagree with the

district court's assessment of Fennell's arguments, which we

are not, we reverse a district court's discovery ruling only

for abuse of discretion. While there may be cases where

discovery of word processing files on a computer hard drive

might well be warranted, Fennell has not met her burden of

demonstrating that the district court abused its discretion

in denying that opportunity here. Thus, we hold that the

district court acted within its discretion in disallowing

further Rule 56(f) discovery, given its conclusions,

-20- 20

supported by the record, that (1) the discovery would entail

substantial risks and costs, and (2) there was little

particularized basis to believe that any evidence of

fabrication could be discovered by Fennell's experts.

-21- 21

B. Grant of Summary Judgment for the Defendant First Step 

1. Standard of Review 

We review a grant of summary judgment de novo, and 

like the district court, we are obliged to view the facts in

the light most favorable to the non-moving party, drawing all

reasonable inferences in that party's favor. Mesnick v. 

General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991), cert. 

denied, 504 U.S. 985 (1992). Summary judgment is appropriate 

when "the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(c). "[T]he mere existence of

some alleged factual dispute between the parties will not 

defeat an otherwise properly supported motion for summary

judgment; the requirement is that there be no genuine issue 

of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 

242, 247-48 (1986). "Moreover, summary judgment may be

appropriate `[e]ven in cases where elusive concepts such as

motive or intent are at issue, . . . if the non-moving party

rests merely upon conclusory allegations, improbable

inferences, and unsupported speculation.'" Woods v. Friction 

Materials, Inc., 30 F.3d 255, 259 (1st Cir. 1994) (quoting 

Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st 

Cir. 1990)). Finally, Fed. R. Civ. P. 56(c) "mandates the

-22- 22

entry of summary judgment, . . . upon motion, against a party

who fails to make a showing sufficient to establish the

existence of an element essential to that party's case, and

on which that party will bear the burden of proof at trial."

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). 

2. Retaliatory Discharge: The Legal Framework 

Although Fennell has framed her retaliatory

discharge claims in one federal count and two state law

counts, the parties agree that the well-established

analytical framework used in Title VII retaliation claims

applies to the state law counts as well. Thus, for purposes

of this appeal, we treat all three counts as subsumed in the

Title VII count.

Where, as in this case and in retaliation cases

generally, there is no direct evidence of the defendant's

retaliatory animus, the McDonnell Douglas burden-shifting 

framework is used to allocate and order the burdens of

producing evidence. See Mesnick, 950 F.2d at 827 (explaining 

the interplay between the burden-shifting framework set forth

in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and 

the standards for summary judgment). To establish a prima

facie case of retaliation, Fennell must show that: (1) she

engaged in protected conduct under Title VII (or here,

Maine's Human Rights Act or Whistleblower's Protection Act);

(2) she suffered an adverse employment action; and (3) a

-23- 23

causal connection existed between the protected conduct and

the adverse action. See, e.g., Hoeppner v. Crotched Mountain 

Rehabilitation Ctr., 31 F.3d 9, 14 (1st Cir. 1994). 

Once a prima facie showing has been made, the

burden shifts to the defendant to articulate a legitimate,

non-retaliatory reason for its employment decision. See, 

e.g., Mesnick, 950 F.2d at 827.9 If the defendant does so, 

the ultimate burden falls on the plaintiff to show that the

proffered legitimate reason is in fact a pretext and that the

job action was the result of the defendant's retaliatory

animus. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 

510-11 (1993); Mesnick, 950 F.2d at 827-28. On summary 

judgment, the need to order the presentation of proof is

largely obviated, and a court may often dispense with strict

attention to the burden-shifting framework, focusing instead

on whether the evidence as a whole is sufficient to make out

a jury question as to pretext and discriminatory animus. Id. 

at 827.

3. Application to Fennell's Case 

 

9. Mesnick dealt with a claim of retaliation for conduct 
protected by the Age Discrimination in Employment Act
("ADEA"). 29 U.S.C. 621-634. The analytical framework for
ADEA discrimination and retaliation cases was patterned after
the framework for Title VII cases, and our precedents are
largely interchangeable. See, e.g., Hazel v. U.S. Postmaster 
General, 7 F.3d 1, 3-4 (1st Cir. 1993) (applying McDonnell 
Douglas framework and a unified retaliation analysis to 
claims under both the ADEA and Title VII).

-24- 24

Although First Step refutes that Fennell has even

made out a prima facie case of retaliation, the district

court apparently assumed that she did. The plaintiff's prima

facie burden is not onerous, and we find that she met that

burden by demonstrating, among other things, that her

termination occurred shortly after her protected conduct, the

report of harassment. See Oliver v. Digital Equip. Corp., 

846 F.2d 103, 110 (1st Cir. 1988) (discharge soon after

protected conduct is strongly suggestive of retaliation).

Fennell cannot seriously dispute that First Step

met its burden of articulating a legitimate, non-retaliatory 

reason for her discharge: that economic and business reasons

led First Step to decide to lay her off, and that the

decision was made prior to her complaint. Thus, we arrive at

the dispositive question: whether Fennell has, on the summary

judgment record, established genuine issues of fact that (1)

First Step's business reasons were a pretext and (2) her

discharge was in retaliation for her reports of sexual

harassment.

The district court granted summary judgment because

it held that Fennell had not shown a genuine issue as to the

fact that First Step decided to discharge her before she made

the report of sexual harassment. The linchpin of the

district court's holding was the October 25 memo, listing

Fennell among those to be laid off. Fennell asserts that the

-25- 25

memo was fabricated some time after her report of harassment.

We discussed Fennell's assertions of fabrication in analyzing

the discovery issue, and we found them to be unpersuasive.

For the reasons stated in that analysis, we hold that Fennell

has not presented evidence that would allow a reasonable jury

to find that the memorandum was fabricated. At bottom,

Fennell's fabrication claims amount to no more than

"conclusory allegations, improbable inferences, and

unsupported speculation." Medina-Munoz, 896 F.2d at 8. 

In addition to the memo, First Step also provided

the uncontroverted affidavits of three employees who swear

that Fennell was on a list of employees to be laid off, and

they saw the list before she lodged her complaint of

harassment. Given the memo and the three affidavits, we

conclude that Fennell has failed to demonstrate a genuine

issue as to whether First Step's layoff decision predated her

complaint. Thus, no reasonable jury could find that First

Step's business-related, non-retaliatory reason for

Fennell's layoff decision was a pretext -- it cannot have

retaliated for conduct that had yet to occur.

Fennell also argues that even if the memo was

legitimate and predated her report, the job action

contemplated in the memo was vague and not final, and that

retaliatory animus motivated her ultimate termination. We

are not persuaded. The October 25 memo used the term

-26- 26

"layoff," and Smith used the same term in his December 20,

1993, letter informing Fennell of her discharge. The next

day, Tucker wrote Fennell a letter stating that her position

had been eliminated. Fennell argues that the October 25 memo

contemplated a "layoff," from which she would be called back

when work was available, but that in fact she was terminated

and her position eliminated. First Step counters that she

was laid off because her position was eliminated, and that it

would have brought Fennell back from layoff if another

supervisory position opened for which she was qualified.

First Step states that it did not transfer Fennell to a non-

supervisory position because it does not generally demote

supervisors to line positions, believing that morale problems

result. Our view of the summary judgment record, viewed

favorably to Fennell, leads to the inescapable conclusion

that the pre-complaint decision to "lay off" Fennell was a

decision to eliminate her position, rather than a temporary

measure with the expectation that she would be called back.

After reviewing the entire record, we hold that Fennell has

not presented evidence that would allow a reasonable jury to

find that First Step had originally decided merely to "lay

off" Fennell but then later decided to take a more permanent

action in retaliation for her complaint.

We also reject Fennell's argument that the pre-

complaint decision to lay her off was not a final decision,

-27- 27

and that it could have been reconsidered later, but was not

because of her complaint. We agree with the district court

that "could have" is not enough. Fennell has presented no

evidence that there was later reconsideration or that the

decision was not final. We recognize that certain other

employees on the layoff list were ultimately not laid off

because of changed circumstances relevant to their jobs, but

that fact standing alone says little or nothing about any

changes in circumstance that might have led to

reconsideration of Fennell's job future.

Fennell makes one other argument worthy of mention.

She claims that after her complaint of sexual harassment she

was "immediately demoted to a lesser position." She does

not, however, develop this argument in her brief, and we are

not clear whether she raises it as a separately actionable

act of retaliation or as evidence of the retaliatory animus

behind her termination. In either case, we agree with the

district court's rejection of her demotion argument. It is

difficult to see how her assignment to packing duties during

the Christmas season rush amounts to a demotion, given that

in her affidavit she described her earlier duties thus: "I

spent most of my time as Warehouse Lead on the warehouse

floor working alongside other warehouse employees." The

demotion argument has not raised any genuine issues of fact

as to retaliation, and in any event the argument is waived

-28- 28

for failure to develop it fully in her brief. See, e.g., 

Ryan v. Royal Ins. Co., 916 F.2d 731, 734 (1st Cir. 1990) 

(explaining that issues adverted to on appeal in a

perfunctory manner, unaccompanied by some developed

argumentation, are deemed to have been abandoned).

Fennell points to a variety of other facts as proof

that First Step could not have wanted to discharge her for

legitimate business reasons. These other facts include her

value as an employee, her awards for Employee of the Month

and the Year, her utility in performing the annual inventory

to be performed shortly after her layoff, the fact that the

First Step catalogue was featured on the Oprah Winfrey show

shortly before her layoff, and First Step's plans for a large

mailing of catalogues in January 1994. In essence, she

attempts to second-guess First Step's business judgment that

a leaner warehouse management team -- that is, a team without

Fennell -- was desirable. None of these other assertions

creates a genuine issue of fact as to whether First Step's

reasons for termination were a pretext, in light of the

October 25 memo and the three affidavits averring that the

layoff list was made before Fennell's complaint. "Courts may

not sit as super personnel departments, assessing the merits

-- or even the rationality -- of employers' nondiscriminatory

business decisions." Mesnick, 950 F.2d at 825. 

-29- 29

In the absence of a genuine issue as to the

authenticity of the October 25 memo scheduling Fennell for a

layoff, Fennell is left with only conjecture and innuendo

that her termination was an act of retaliation. The district

court appropriately granted summary judgment for First Step.

-30- 30

III. III. 

Conclusion  Conclusion  

For the foregoing reasons, the judgment of the

district court is affirmed. 

-31- 31