Cynthia M. BRISSETTE,
et al, Plaintiffs

v.

FRANKLIN COUNTY SHERIFF'S
OFFICE, et al, Defendants

No. CIV.A.98–30062–MAP.

United States District Court,
D. Massachusetts.

Jan. 6, 2003.

Lynn Nielsen, Fein, Pearson, Emond & Fein, Springfield, MA, for Cynthia M. Brissette.

Alan M. Katz, Katz, Sasson & Hoose, Springfield, MA, for Susan S. Heath.

Daniel J. Sheridan, Sheridan & Sheridan, Holyoke, MA, for Franklin County Sheriff's Office, Commonwealth of Massachusetts.

## MEMORANDUM OF DECISION

PONSOR, District Judge.

## I. INTRODUCTION

Cynthia Brissette and Susan Heath, two former correctional officers, have brought this suit under federal and state law against their erstwhile employer, the Franklin County Sheriff's Office (FCSO), claiming discrimination based upon their gender (Counts I and VI), sexual harassment (Counts IV and IX), maintenance of a hostile work environment (Counts III, VII and VIII), and retaliation (Counts V, X and XI).[1] After all parties waived jury, the court heard evidence over seventeen days. For the reasons set forth below, the court has found in favor of the two plaintiffs on some, but not all, of their claims.

The court's decision may be summarized as follows. First, the plaintiffs have proved by a preponderance of the evidence that during the relevant period the FCSO maintained a hostile work environment for its female employees. Most significantly, women correctional officers, including the two plaintiffs: (1) were repeatedly told that females were not suited for correctional work—particularly work as "line" officers directly in contact with inmates; (2) were disciplined, or disciplined more harshly, for infractions for which males received either milder discipline or none at all, and (3) were subjected to a stream of gender-based, demeaning comments, attitudes and behavior. This environment compromised the plaintiffs' ability to perform their jobs and caused them substantial emotional distress, for which they are entitled to damages.

Second, the defendants retaliated against the plaintiffs for making formal and informal complaints charging discrimination. The retaliation took the form of (among other things) constant and excessive scrutiny of the plaintiffs' work performance, repeated episodes of intimidating

---

1. Defendants are technically the FCSO and the Commonwealth of Massachusetts, which since July 1, 1997 has had financial responsibility for the FCSO. For simplicity, the court will refer to the defendants in the singular as the FCSO.

questioning, and disproportionately harsh discipline, all designed to punish the plaintiffs for bringing their complaints, and to deter them (and perhaps others) from invoking the protection of the law. This retaliation was another, independent source of substantial emotional distress, deliberately and knowingly perpetrated by the defendant, for which the plaintiffs are entitled to monetary damages.

Both plaintiffs claim that one expression of the bias against them as women was their terminations. On this, the evidence is not persuasive. Although they were terminated in an environment tainted by gender-based discriminatory animus, the weight of the evidence demonstrates that the defendant had adequate independent grounds for terminating both the plaintiffs and would have taken the same action regardless of their gender. Similarly, the court cannot agree that the denial of promotions to the plaintiffs arose from the defendant's bias against them as women. The decisions not to grant the promotions were, again, supported by legitimate and non-discriminatory reasons.

In reaching these conclusions, it has been necessary for the court to examine in considerable detail the *minutiae* of the plaintiffs' work life at the FCSO over several years. The picture that emerges from this evidence is, perhaps inevitably, far from uniform. While the plaintiffs clearly suffered from the effects both of a hostile environment and of retaliation, other forces were at work at the FCSO office during the same period. It is clear that the current administration generally recognized at an early stage the unfairness, as well as the lack of professionalism, inherent in gender-based harassment or discrimination, and began at some point taking steps to eliminate it from the FCSO. These steps were sometimes delayed, halting and ambivalent. Nevertheless, the evidence demonstrated that over the years progress has gradually been made. The atmosphere of hostility against women employees at the facility has dissipated, and many of the officers who fostered it no longer work at the FCSO and are not welcome there. It is obvious that, as in law enforcement and the military, women working within the correctional system can be—and are—outstanding employees at any level and in any context. While the slow progress at the FCSO over the years is laudable, however, it cannot conceal the fact that Susan Heath and Cynthia Brissette suffered greatly from the stereotypes and ugly, hidebound attitudes that infected the environment during the time they worked there.

Weighing these factors, the court will award each plaintiff the sum of $150,000 in compensatory damages, plus $10,000 (in the case of Heath) and $5,000 (in the case of Brissette) to reimburse them for medical expenses incurred by them as a result of the defendant's misconduct. Moreover, due to the particularly egregious and deliberately vindictive nature of the defendant's retaliation, the court will award the additional sum of $20,000 in punitive damages to each of the plaintiffs. Finally, both plaintiffs are entitled to a full award of reasonable attorneys fees.

## II. FINDINGS OF FACT

In setting forth these findings the court has—incredible as it may seem given the length of this memorandum—*not* felt compelled to specify every particular fact it has considered. The facts summarized below are sufficient to anchor the court's conclusions of law, and to provide a good sense of the evidence presented at trial. The fact that a particular item of evidence has not been mentioned does not mean that it has not been sifted and weighed.

After a brief overview of the Franklin County Sheriff's Office, the discussion below has been broken down temporally as follows: (A) pre–1993 (the McQuade Years), (B) 1993–1995, and (C) 1996 to present.

## A. *The Franklin County Sheriff's Office*

The Franklin County Sheriff's Office ("FCSO") operates the Franklin County Jail and House of Correction, which was built in 1886. Although the facility houses female inmates, the vast majority of the inmates are male.

Historically, the wife of the Sheriff was the primary caretaker of the few female inmates confined there. In past decades, on some occasions, part-time women employees (known as "matrons") were called in to assist as needed with the female inmates.

In 1987, the FCSO started to hire women as full-time correctional officers. Susan Heath ("Heath"), a plaintiff in this case, was one of the first full-time female correctional officers.

Prior to 1992, women officers were not permitted to enter the "jail" or "house" blocks, the housing units for male inmates. Rather, women officers were limited to caring for female inmates in the Women's Ward. In 1992, Sheriff Donald McQuade ("McQuade") changed this policy, allowing women officers to go into the male housing units but only when accompanied by a male officer.

Later that same year, an election was held for the position of Sheriff. McQuade, the incumbent, ran against Frederick Macdonald ("Macdonald"), who was supported by many FCSO employees, including Heath. Macdonald won the election and took office in January of 1993.

In Spring of 1993, the new Sheriff for the first time created a rank structure at the FCSO. The hierarchy was as follows: (1) correctional officer ("C.O."), (2) sergeant ("Sgt."), (3) lieutenant ("Lt."), (4) captain ("Capt."), (5) assistant deputy superintendent ("A.D.S."), (6) deputy superintendent ("D.S."), (7) Superintendent/Special Sheriff ("S.S."), and (8) Sheriff. These eight positions constituted the "custodial hierarchy." Employees holding one of the first three positions (correctional officer, sergeant and lieutenant) were part of a bargaining unit and were represented through a union.

During the first years of Macdonald's tenure, women continued to be able to enter the house and jail blocks, but only when accompanied by a male officer. On February 20, 1996, the policy was changed to mandate gender neutral post assignments and permit female correctional officers to move unaccompanied throughout the facility. This policy remains in effect to this day. In 1997, the FCSO updated its sexual harassment policy. The new policy permitted zero tolerance for any acts of harassment and required investigation of all complaints.

On July 1, 1997, the government of Franklin County was abolished and the employees of the FCSO became employees of the Commonwealth of Massachusetts. Mass. Gen. Laws ch. 151, § 567(j)(1).

Currently, there are roughly one hundred and twenty-five officers at the FCSO. Some officers work in transportation, driving prisoners to and from the FCSO; others supervise special programs, such as the DARE program. Those directly in charge of the care and custody of prisoners occupy so-called "line" positions. In the history of the FCSO only four women have ever occupied ranking officer positions on the line—that is, positions above the lowest rank of C.O. There are presently no women of rank in line positions at the FCSO.

## B. *Pre–1993: The McQuade Years*

### 1. *Plaintiff Susan Heath*

At the time of trial, Susan Heath ("Heath") was a 44–year–old woman, born in Greenfield, Massachusetts. She resided with her nephew, whom she raised. After graduating from high school, Heath attended Westfield State College, majoring in Criminal Justice and Economics. She graduated in 1980 with a Bachelor of Arts degree. In the summer of 1979, Heath was employed by the Greenfield Police Department as a reserve police officer. She later applied for a full-time position as a police officer but was turned down.

Beginning in January of 1980, Heath interned at the Franklin County Sheriff's Office ("FCSO") for a few months. During this time, no inappropriate comments of a sexual or derogatory nature were directed at her. After her graduation from college, Heath was hired by the FCSO on April 29, 1980 as a part-time correctional officer. She worked in this capacity from 1980 until 1983.

In 1981, Heath was diagnosed with muscular dystrophy. Although her condition has made a career as a full-time police officer impossible, it has not prevented her from acting as a correctional officer.

While employed by the FCSO as a part-time officer, Heath's duties included feeding the female inmates and locking them in at night. Other than these, she performed none of the typical tasks of the male correctional officers. In addition, pursuant to the pre–1992 policy, there were sections of the facility where she was not permitted to work.

Heath confirmed that between 1980 and 1984, as noted above, women at the jail were referred to as "matrons." She also stated that during this time, she was sometimes told that women employees were only tolerated out of necessity because of the occasional female inmates. Beyond this, however, Heath did not recall being the target of inappropriate comments during her four years of part-time work.

In 1984, Heath left her employment at the FCSO and moved to Boston. While in Boston, she worked at Filene's Basement as a store detective and as the court officer liaison.

In 1987, when the FCSO started to hire women full-time, Heath left Boston and moved back to Greenfield. That same year, Heath began treatment with Dr. Eric Muten ("Dr. Muten"), a psychologist, for anxiety and depression. Her reasons for seeking treatment at that time were personal and did not involve her employment. In July of 1988, the FCSO re-hired Heath as a full-time correctional officer.

As noted, between 1988 and 1992, women were barred from the House Block, where convicted inmates were housed, and the Jail Block, where inmates awaiting trial or sentencing were housed. The number of female inmates varied. When there was a female inmate in the facility, Heath and other women officers were assigned to the Women's Ward, where they carried on the usual custodial duties. In contrast, when no female inmates were present, Heath was assigned to the Trap,[2] the Floor,[3] the Desk,[4] or the Log,[5] all positions

---

2. The "Trap" controls the flow of traffic into and out of the facility. It prevents people from entering and exiting freely.

3. Those who work the Floor oversee inmate movement. They guard the doors that are used by the inmates.

4. Those assigned to the Desk are responsible for answering and making phone calls.

5. Those assigned to the Log are responsible for recording the events that take place at the facility.

that would minimize the need for extended or substantial interaction with male inmates.

Between 1988 and 1992 many officers and supervisors were unhappy with the presence of full-time female correctional staff at the facility. Heath heard various male officers publicly make offensive remarks. Specifically, she heard Forbes Byron ("Byron"), who was a correctional officer at that time, say that the Sheriff "f—ing screwed us again by hiring more women." Senior Officer ("S.O.") Joseph Brozo ("Brozo") called Heath "useless," and S.O. Charles Barrett ("Barrett") said that women could not do correctional work and should not be working at the FCSO. Furthermore, in response to inquiries about post assignments, S.O. Barrett would yell at the women: "You know where you need to go!" The intended substance of these sorts of remarks was that women officers could only cover the Women's Ward. D.S. Howard Sheperd, Jr., ("Sheperd"), who was then a correctional officer, stated that women should not be at the FCSO and were incapable of handling the work. John Zewski ("Zewski"), who was then a correctional officer, said that women should not be working at the FCSO, could not manage the job, and would be transferred when a new facility opened in Ludlow. Heath also testified that Zewski called Charmaine Coburn ("Coburn"), the first woman hired as a full-time correctional officer at the FCSO, "crotch burn" and other women "douche bags." In his deposition, D.S. Sheperd stated that he had heard ranking officers call Coburn "crotch burner." C.O. Peter Dionne ("Dionne") said that women did not belong at the jail and that they could not do the job. Then–C.O. Edward Chase ("Chase") stated that women should not be subjected to surroundings like the FCSO. Then–C.O. James Leonard ("Leonard") expressed the same sentiment.

Some of the harassment of female staff was graphically vulgar. An officer named Chamberlain, who was a spare officer at the time, asked Heath on four occasions if she liked it "doggy style." He also asked to see her breasts and inquired whether she had big breasts. Chamberlain also expressed his opinion that a woman could not be the shift commander. Eventually, Chamberlain was promoted to the position of full-time officer, though by 1993 it appears he was no longer working at the facility.

In 1990, Heath attended the correctional officers' training academy, but, for unspecified reasons, only attended for one week. Normally the training academy lasted six weeks. Unlike most officers, Heath never received a certificate confirming that she had successfully completed the academy.

The policy on academy attendance at this time was inconsistent. On the one hand, the FCSO employment application stated that officers had to attend the academy within one year of being hired, and there was evidence that officers were terminated for failing to complete academy training. On the other hand, many officers, including supervisors, possessed certificates for training academies that, like Heath's, lasted only 40 hours. D.S. Hall testified that he never attended a Massachusetts correctional officer academy at all. In addition, one officer who worked in the kitchen was excused from the academy completely due to his medical condition.

Heath testified that the derogatory comments she heard and the general atmosphere at the FCSO during the years up to 1993 "didn't make me feel good," but she was able to "handle it." When the offensive comments were being made, Heath sometimes complained verbally to administrators at the jail, but no action was taken.

On January 31, 1992, Heath filed a grievance with the union complaining that she was being discriminated against with respect to vacation time, based on her gender. Sheriff McQuade and D.S. Snow had informed Heath that no two women could go on vacation at the same time, because there would not be enough female officers remaining to staff the facility. At the time, regulations mandated that both a man and a woman be on duty if there were both male and female prisoners housed in the facility.

Heath later filed a second grievance to include rude treatment of Heath by S.O. Barrett, Heath's shift commander. On July 17, 1992 Barrett refused to permit Heath to read the log when she came on duty, a routine part of a an officer's job. His reason, in essence, was that review of the log was unnecessary because Heath would only be working in the Women's Ward and therefore did not need to know what was happening in the rest of the facility. Later on, Barrett harshly reprimanded Heath for not wearing her badge. In fact, Heath had not worn her badge for a year and a half because she had lost track of it in packing for her return to Greenfield. On July 24, 1992, Heath filed a second grievance complaining specifically about S.O. Barrett's conduct towards her, and mentioning, in addition, C.O. Chamberlain's offensive questions, including the "doggy style" remark. Both officers denied wrongdoing.

On August 18, 1992, Sheriff McQuade sent Heath a letter informing her that her grievances had been denied. Heath felt that there was nothing else she could do. She did not take the grievances to arbitration.

### 2. Cynthia Brissette

At the time of trial, Cynthia Brissette ("Brissette") was forty-four years old. Af-ter graduating from high school in 1975, she worked in her family's furniture business for the next ten years. She also did some work as a secretary, waitress and home health aide.

In 1990, Brissette was hired by the FCSO as a part-time officer. Her duties included working in the Women's Ward, the desk and the trap. She did not become a full-time correctional officer until after Macdonald's 1992 election.

### 3. Additional Facts

At trial, Lt. Robert Hunter ("Hunter") testified credibly that employees at the FCSO frequently stated that women did not belong there; he added that this general view has been expressed in his presence by many employees and administrators up to the present time. Hunter has been an employee of the FCSO since September 6, 1983. He also served as a union steward from 1986 until 1989 and from 1990 to 2001.

The years up through 1992 at the FCSO, viewed from the perspective of female employees, can be described as a kind of Dark Age. The responsibilities of female staff were drastically limited, women were constantly told they were unfit for mainstream correctional work, and female staff were virtually unprotected from degrading remarks directed at them by their cruder male colleagues. The atmosphere and the conduct were known to senior administrators, and little or no corrective action was taken. The hostile environment was emotionally distressing; it also undermined the ability of female staff to do their work.

### C. 1993 to 1995: The Macdonald Years Begin

#### 1. Susan Heath

Heath actively supported Frederick Macdonald in the 1992 election. She pre-

sented Sheriff Macdonald with a copy of her July 24, 1992 grievance shortly after he took office in January of 1993, informed him that it had been denied by McQuade and requested that he reconsider and act on it. A few days later, the Sheriff called her back, told her she should have been wearing her badge, handed her the grievance and a new badge, and said no more. At the time, the Sheriff and Heath were on friendly terms. Full-time officers were expected to wear a badge while on duty. According to Heath, when Sheriff Macdonald denied her grievance, she felt miserable and belittled.

On April 23, 1993, the Sheriff made his first promotions at the FCSO. Because he was new to the institution, he relied on seniority only for the first round of promotions. No applications were submitted for the newly created positions.

The union contract in effect from 1993 to July 1995 obligated the Sheriff to consider the following when making promotions:

(a) Seniority, . . .

(b) Ability to do the job as determined by, but not limited to:

(i) Experience and competence (job performance) in the same or related work; and

(ii) Education and training related to the vacant position.

(c) Work history, education and training.

(Exhibit A at 11, § 3).

On June 2, 1993, Macdonald named Heath to the post of commissary officer, even though C.O. Leonard, who was more senior, had applied for the position as well. As commissary officer, Heath was responsible for the management of the canteen, which was located on the third floor of the main building.

The canteen position was a Monday through Friday job and Heath was allowed to work from 8 a.m. to 4 p.m., without the requirement that she cover weekends or nights. Correctional officers in regular line positions worked nights and weekends frequently, so the regularity of the canteen officer's hours made that slot especially attractive. This arrangement was particularly convenient for Heath, who was struggling to raise a nephew with a learning disability. Heath's duties in the canteen included contacting wholesale suppliers, paying taxes, pricing the merchandise and making sure that the inmates got what they ordered promptly. While canteen officer, Heath also helped out occasionally in other posts, taking overtime shifts where she was assigned to the desk, trap and floor, sometimes serving as the shift commander.

Shortly after she was appointed as the canteen officer, Heath approached C.O. Jason Kilgour ("Kilgour") and asked him if he wanted to be the back-up canteen officer. Kilgour agreed and received his training exclusively from Heath. Whenever Heath was out on vacation or sick, Kilgour would take over the management of the canteen.

Between 1993 and 1996, various individuals continued to make denigrating remarks about the competency and capacity of female correctional staff. Byron, Phillip Kostecki ("Kostecki"), Sheperd, Zewski, Kilgour, Kevin Brown ("Brown") and Kevin Gamache ("Gamache") all said, in various direct ways, that women did not belong at the facility and could not do the job. Brozo called Heath "useless" in front of two shifts. As during the prior administration, Heath heard numerous male employees continue to call Coburn "crotch burn" and female correctional officer Diane Birdsong, "bird brain." As a result of these remarks, Heath understandably felt belittled and demeaned.

On February 8, 1994, Birdsong filed an MCAD complaint alleging that Correctional Officer Leonard, Lieutenant Zewski and Officer Kevin Brown were sexually harassing her. She specifically accused Leonard of unsnapping her bra and touching her breasts while at work and following her home after work. Leonard resigned while an investigation into this and other charges against him was pending.

In May of 1995, Heath had a discussion with then-Sgt. Sheperd. Sheperd informed her that he had asked the Sheriff about who would be promoted to Sergeant later that month. According to Heath, Sheperd told her that the Sheriff responded: "We have to give it to f——ing Fairbrother. She has the seniority." Fairbrother was a female correctional officer. The remark is significant even if the Sheriff never uttered it, since it was conveyed by a superior officer to Heath as the Sheriff's sentiment, in an effort to denigrate a female officer's entitlement to promotion.

The question of whether promotions at the FCSO were based on seniority plagued the trial. It became clear as the testimony progressed that seniority was *one* prominent factor considered, but did not always govern. For example, in February 1995 Byron and Hall were promoted to Captain, even though they were fourth and seventh in seniority on the list of applicants.

In May of 1995, three people were promoted to sergeant, including Coburn and Tamma Fairbrother, both females, even though a male C.O., Leonard, was senior. There was some evidence that Leonard's timidity around inmates made him inappropriate for promotion, and he had been accused of sexual harassment. In general, seniority controlled promotions unless an individual at a lower rank exhibited outstanding qualities, or the individual with seniority (such as Leonard) exhibited some serious professional flaw.

On July 1, 1995, a new union contract was created. The section of the contract that dealt with promotions stated in relevant part that "[t]he principle factor in making promotions shall be the efficiency and the integrity of the Franklin County Sheriff's Department." Other factors to be considered included:

(a) Seniority . . .

(b) Seniority within rank;

(c) Ability to do the job as determined by, but not limited to:

 (i) Experience and competence . . . and

 (ii) Education and training related to the vacant position;

(d) Work history, education and training; and

(e) Promotional examination to include a Standards and Procedures Manual component and a situational component.

(Exhibit A at 13–14, § 3).

In the summer of 1995, there were two applicants for the position of Lieutenant, Zewski and Coburn. Again, although Zewski was the more senior applicant, Coburn, the female, was promoted to the position instead. Zewski, however, had clearly been having problems on the job. He had been demoted from lieutenant in February of 1995, for reasons that will be detailed below, and reassigned as a sergeant in the records department.

In July of 1995, Heath asked the Sheriff whether the canteen position could be raised from the level of a C.O., at the bottom rung, to a position of rank, such as sergeant. The Sheriff was receptive to the idea and asked Heath to submit something in writing. Heath followed his instructions, submitting a letter on July 21, 1995. In this letter she mentioned that she had not applied for vacant positions in the past

because she wished to remain in the canteen position. During this time, as noted, Heath was caring for her nephew, and the regular canteen hours were very important to her.

### 2. *Cynthia Brissette*

On July 1, 1993, the FCSO appointed eight new full-time correctional officers, including Cynthia Brissette, who was the only woman appointed. Out of those appointed on this date, Brissette was ranked seventh on the seniority list. Brissette felt that her ranking was incorrect, because she had the earliest start date of the eight and therefore should have been ranked first. Brissette ultimately grieved her ranking, but it was not until April of 1996 that the seniority list was finally amended to place her at the top.

Between July 1, 1993 and December 31, 1993, Brissette was in a probationary period. During that time, she took three and a half days off for sick leave or leave without pay.

In November of 1993, Capt. Brozo, Lt. Barrett, and D.S. Kostecki evaluated Brissette. Barrett and Kostecki found no deficiencies, but Brozo found Brissette to be merely satisfactory in five areas and unsatisfactory in seven, including communication with inmates and other officers. Also in November of 1993, Brissette attended the training academy for six weeks where she ranked third out of ten.

Later that same month, the Sheriff's office decided to terminate Brissette for her use of time off and other deficiencies that Capt. Brozo found in her performance. The Union, however, convinced the Sheriff to give Brissette another chance, and she eventually completed the probationary period successfully.

On September 30, 1994, Brissette wrote a letter to D.S. Kostecki objecting to the fact that, when covering the Women's Ward, she often spent eight hours straight without being relieved, even to use the restroom. The situation had been going on for some time, due to the shortage of female C.O.s at the facility. Brissette proposed in her letter that two female C.O.s always be assigned to the Women's Ward, when necessary, instead of one.

Despite Brissette's complaint, female staffing on the Women's Ward continued to be a problem for the balance of 1994 and into 1995. On August 31, 1995, Brissette again wrote a letter to the administration regarding her posting in the Women's Ward for eight hours without relief. She noted that the letter was her third on the subject and that she had also made several verbal complaints. The problem was never given priority and was only gradually resolved.

Brissette was the target of gender-based harassment during the 1993–1995 period. At one point Sheperd made the comment in the hearing of other officers that Brissette had a tattoo on her forehead that read "FMH," standing for "Fuck Me Hard."

### 3. *Additional Facts*

The January 1994 investigation of complaints filed by both male and female employees of the FCSO against then-Lieutenant Zewski revealed numerous incidents of sexual harassment and disparagement of women officers on his part. These episodes included calling women "stupid," referring to Tamma Fairbrother as "just a fucking woman," informing Diane Birdsong that he had discussed her marital relations with her ex-husband, and frequently using the infantile nicknames of "Birdbrain" and "Crotchburn" for officers Birdsong and Coburn. In December of 1994, Zewski refused to relieve a female corrections officer who was suffering from

a migraine. The administration found that this conduct constituted sexual harassment. As a result of these complaints, on February 13, 1995, Zewski was reassigned from the position of Lieutenant on the 11:00 p.m. to 7:00 a.m. shift to the position of Sergeant in records. In this non-supervisory position, Zewski was kept away from the other officers.

Lieutenant Hunter testified that during this period, as before, he heard regular expressions of the opinion that women in general lacked the ability to do corrections work. Individuals making these remarks included S.S. Byron, D.S. Hall, D.S. Sheperd, Lt. Brown, C.O. Gamache, and the Sheriff himself. Hunter heard women referred to as "cunts" by, among others, D.S. Hall.

During the years between 1993 and 1995 the FCSO took some steps to improve its treatment of women. Female correctional officers were, on paper at least, given equal status with males, and some grosser incidents of harassment were investigated. Nevertheless, many elements of the hostile environment persisted from earlier years and continued to take a tremendous toll upon female employees, both emotionally and professionally.

D. *1996 to the present*

1. *Susan Heath*

On May 31, 1996, Lieutenant Coburn was suspended for three days for failing to monitor all radio communications during her shift. A male officer, whose sleeping on duty had gone unnoticed due to this lapse, was terminated. Not long after this discipline, Coburn resigned. Although the evidence was insufficient to prove that Coburn (who did not testify) had left as a response to discrimination, her departure did deprive the facility of the highest ranking female line officer. No other female has at any time since then—well over five

years now—reached the rank of lieutenant in a line position at the FCSO.

In September of 1996, three openings for new lieutenant positions were posted, requiring at least "one year of full-time supervisory experience in correctional institution work ..." Heath applied for one of the lieutenant positions, indicating that she would take a promotion into any shift. At the time, she was willing to move out of the canteen because her nephew was requiring much less of her assistance. In her letter of application, Heath mentioned that she had experience on all three shifts, when working over-time as a substitute fill-in. At the time of her application, Heath held the lowest rank, C.O., and had been working for some time mainly in the canteen. Following her conversations with the Sheriff, however, she had, as noted, made the proposal that the canteen position be upgraded.

At the time the new lieutenant positions were being considered, there were three sergeants at the FCSO: Hunter, Timothy Waldron ("Waldron") and Tamma Fairbrother. Despite Fairbrother's seniority, the promotion board initially recommended Hunter, Waldron and Leslie Troczynski (a male C.O.) for promotion to lieutenant. The failure of the board to recommend Fairbrother for the promotion, despite her seniority, reflected a deeply ingrained, discriminatory disinclination at the FCSO to move females into upper-level supervisory positions.

In October 1996, the three lieutenant positions were re-posted, with the requirement of "supervisory" experience dropped. The change was made to protect the administration if and when the promotion bypassed Fairbrother, a female with supervisory experience, in favor of a less experienced male with no background as a supervisor.

While the decision regarding the promotions to lieutenant was pending, in December of 1996, C.O. Jennifer McDonough alleged that C.O. Jeffrey Cranston, who was the shift commander on that day, came up behind her, grabbed her buttocks and commented that they were "tight and firm." The administration proceeded to investigate this complaint and eventually disciplined Sgt. Fairbrother, who was not even on duty when the incident occurred, for failure to investigate and report Cranston's misconduct. On December 24, 1996, five days before the promotions to lieutenant were ultimately awarded, Fairbrother was demoted from Sergeant to C.O. as pretext to avoid giving her the promotion to lieutenant. The actual malefactor, Cranston, was allowed to resign before the investigation had formally concluded. On December 29, 1996 all three lieutenant positions were awarded to males. Although the FCSO's treatment of Fairbrother was not formally a part of this litigation—she was originally a plaintiff, but dismissed her suit before trial—her fate evidences the atmosphere of discrimination against women at the facility during this period, and particularly the unwillingness to give females jobs as "line" supervisors.

Heath's own application for one of the lieutenant positions was complicated by the fact that she was eventually persuaded to apply for a promotion to sergeant as well. Five new sergeant positions were posted before the decision on the lieutenant positions was final. In December 1996, around the same time that the three promotions to lieutenant were made, Heath and four others, including two other women (Susan Corey and co-plaintiff Cynthia Brissette) were made sergeants. Corey, who worked in the DARE program, was not a line officer, and Heath continued to work in the canteen.

The decision not to promote Heath to lieutenant at this time was not animated by gender-based discrimination. The bulk of Heath's most recent experience as a C.O. was in the canteen. Both then-Superintendent Kostecki and the Sheriff believed—mistakenly, but in good faith—that Heath wished to remain in the canteen due to her family obligations. Moreover, they reasonably concluded that, while the canteen slot might justify a sergeant rank, it was not appropriate for the rank of lieutenant. In addition, they had justified concerns about Heath's competence to handle a lieutenant's responsibilities.

The promotions of women to the sergeant positions were not received well by the rank and file. When a memo was posted documenting the Sheriff's action, someone wrote "WHAT!" in large letters next to the women's names. After her promotion, many other C.O.s began ostentatiously saluting Heath. Saluting was not a practice at the FCSO, and these gestures were meant to be derisive.

Heath's treatment after her promotion was painful to her emotionally. During this time she was still seeing Dr. Muten to receive treatment for the stress she was suffering at work and in her personal life.

In January of 1997, Heath was accused of improperly using her status as a correctional officer to intervene in a dispute between her brother and his estranged wife. Heath's sister-in-law accused Heath of using her uniform insignia to give her color of authority to improperly enter the wife's home. An investigation followed. Although it resulted in no disciplinary action, Heath felt the inquiry was an inappropriate intrusion into a personal matter. The incident added to the stress she was undergoing.

The harassment experienced by Heath at work greatly increased after it became known that she was supporting Fairbroth-

er in her grievance over her December 1996 demotion from sergeant to C.O. Various supervisors asked Heath about the substance of her proposed testimony, whether she had received a subpoena and whether she was documenting incidents at work to protect herself from retaliation. Near the day of her testimony, one supervisor, Sheperd, drove by her house slowly three times. In May of 1997, while the arbitration was pending, Deputy Superintendent Hall confronted Heath and told her to "be careful" and not to "step on his toes." Medical records from about this time confirm that Heath suffered stress and anxiety as a result of the hostile response to her support for Fairbrother.

On May 16, 1997, Heath testified at Fairbrother's arbitration hearing. In the days immediately afterwards male officers made an especially ostentatious and mocking display of saluting.

On May 31, 1997, Heath filed the MCAD complaint that eventually formed the basis for this litigation. The complaint charged that FCSO administrators were saying that women did not belong in the facility, that Heath had suffered retaliation for complaining about discrimination, and that she had been denied promotion to lieutenant due to gender-based discriminatory animus.

Following Heath's filing of the MCAD complaint, the defendants began a campaign of retaliation by aggressively questioning and disciplining Heath on the flimsiest of pretexts. Thus, in August of 1997 Heath was questioned by D.S. Hall about the fact that she had reviewed her time cards—a practice that was permitted at the FCSO. On September 2, 1997 Superintendent Byron summoned Heath to his office and required her to type out responses to two pages of questions and submit to two and one-half hours of interrogation. Some of the questions were sup-

plemental to those asked on August 11 about the time cards incident. Following the questioning, D.S. Hall ordered Heath to empty her pockets. On October 1, 1997, when Heath opened the door to the commissary, she was surprised to discover a startled D.S. Hall, who had evidently been eavesdropping.

Constant incidents of this sort took their toll on Heath, who continued to see her counselor and began to receive medication for depression and anxiety. Physical examinations revealed elevated blood pressure.

As 1997 drew to a close, the pressure on Heath continued. On November 24, 1997, Heath was involved in a confrontation with a C.O., a subordinate officer, in which the officer refused to comply with a direct order. Heath received an unwarranted verbal reprimand for being abusive to the officer in front of an inmate.

On December 5, Heath was informed that she would have to attend the training academy, despite the fact that she had attended seven years earlier, albeit in a condensed format. Her request to be given time to lose weight before attending was denied. The sudden demand that Heath attend the academy, at this stage in her career, was unprecedented and was part of the campaign of retaliation.

On December 23, 1997 Heath was falsely accused of leaving her post to make an improper entry into the log and was given an unjustified three-day suspension. The evidence showed that similar conduct by male officers did not lead to discipline. The suspension was later grieved and Heath ultimately prevailed.

On December 24, 1997, an investigation was conducted into whether Heath was improperly parking in the handicapped parking space at the FCSO. Photographs were secretly taken of Heath's car on

three different occasions. No one approached Heath prior to the investigation to ask her to park somewhere else. No formal discipline was ever initiated against Heath based on parking improprieties.

On December 31, 1997, the administration posted the names of the officers who would be attending the pre-screening physical for the training academy. Heath was the only ranking officer on the list. After the pre-screening, Heath was required to run around the track, despite her muscular dystrophy, and was thereafter disqualified from the remainder of the course. The experience was extremely humiliating for Heath, and was intended to be so.

Heath was never disciplined in connection with any deficiencies related to attendance, or lack of attendance, at the academy, nor was any such deficiency mentioned in reviews of her performance.

The retaliation and harassment of Heath intensified in 1998. On January 12, D.S. Byron called Heath and told her to report to his office immediately. When she arrived, she found herself in a room with Attorney Daniel J. Sheridan ("Sheridan"), D.S. Hall, D.S. Shepard, and S.S. Byron. Attorney Sheridan proceeded to question Heath in an excessively aggressive manner about the log incident on December 23, 1997. The next day Heath was suffering from elevated blood pressure, shaking hands and diarrhea, and she was unable to work.

During this time C.O. Kilgour was occasionally managing the canteen when Heath was absent. Kilgour informed D.S. Hall that, when he substituted for Heath, he found the canteen messy and disorganized. Without approaching Heath or informing her, D.S. Hall told Kilgour to take pictures of the canteen's condition.

In February of 1998, there was a posting for the position of lieutenant. Heath applied for the position, although by this time she had not performed in a full-time line position in five years. Heath, as a sergeant at the time, was the most senior applicant. The promotion board nevertheless decided to award the position to C.O. Kevin Brown ("Brown").

The decision to promote Brown rather than Heath was not affected by gender bias. Brown was a decorated military veteran who had started the facility's defensive tactics course. He had outstanding administrative and inter-personal skills. At the time, as noted, Heath's recent line experience was limited, and her performance in the canteen was below par. The promotion decision turned on considerations independent of gender.

As 1998 unfolded, however, the harassment and retaliation against Heath continued to intensify. An incident in April was typical of the campaign.

Heath from time to time employed an inmate as an assistant in the canteen. In April, Heath's assistant at the time, an inmate named St. Armand, began to behave inappropriately, physically touching Heath on two occasions. Heath sent the inmate back to his housing block, reported the incident to the administration and sought advice from the FCSO's consulting psychologist, Dr. Maurice Regan, about the best way to handle the incident.

After Dr. Regan spoke to Heath, he was called to D.S. Byron's office, where he was questioned for ten minutes by Attorney Sheridan, mainly about Heath, and required to submit a written report. Dr. Regan testified credibly, first, that this kind of response to a complaint about an inmate was in his experience unprecedented. Normally, when conduct of this sort occurred, the inmate was simply moved out of the position. Second, Dr. Regan

testified that his impression was that he was being questioned in an effort to discover, not what St. Armand had done, but to unearth material the administration could use against Heath.

Dr. Regan's impressions are consistent with the administration's treatment of Heath following this incident. She was again summoned to D.S. Byron's office, where she was again subjected to aggressive questioning about the incident from Attorney Sheridan. The experience, which would normally have been handled as a matter of routine, left Heath feeling as though she were a criminal being investigated. It was part of the campaign of retaliation against Heath for her complaints about her discriminatory treatment.

Sheridan's demeanor towards Heath during the questioning was often harsh and deliberately intimidating. Lt. Hunter testified to being present during more than one of these interrogations where Sheridan would become heated and yell at Heath. In response, on occasion, Heath was reduced to tears.

In May of 1998, Heath heard disciplinary proceedings against herself being discussed over the facility's internal communications system. She became so upset that she consulted with the nurse, who found her blood pressure to be elevated.

In June of 1998, D.S. Raymond Brown performed an audit of the canteen, the first and only such audit in all of Heath's years in the commissary.

During August of 1998, still unbeknownst to Heath, her back-up Kilgour was continuing to take photographs of the canteen and pass on evidence to the administration whenever the area appeared messy or disorganized. On September 2, 1998 Heath received a memo from D.S.

Hall reprimanding her for giving an inmate an empty paper bag.

Throughout this period Heath continued to consult her counselor to receive treatment for the stress she was under, which was by now related almost exclusively to her employment situation. In response to her conditions, Heath began to exhibit new physical symptoms, irritable bowel syndrome, for which she occasionally required adult diapers.

The final fourteen months of Heath's employment may be more briefly summarized, since they were overcast by Heath's physical injuries, which were independent of any claims of harassment. In October of 1998, Heath suffered a back injury subsequently diagnosed as a lumbosacral sprain, which resulted in Heath being out of work entirely for three and a half weeks. Thereafter, while on light duty, Heath re-injured her back twice during 1999 and could not return to work full-time until September of that year.

During her time on light duty, in March of 1999, with no warning, Heath was removed from her position in the canteen, on the ground that she was not performing her job properly. Although Heath's level of performance was always not high, and the canteen was sometimes messy and disorganized, other areas in the facility, supervised by males, had far more serious problems of dirt and disorganization. These males were not removed from their positions, and Heath was. Moreover, no significant deficiencies were ever documented regarding the canteen during formal inspections. A male officer, or an officer against whom the administration was *not* determined to retaliate, would have been given, at a minimum, adequate notice of performance deficiencies, and an opportunity to cure them, before being removed from his position. The removal of Heath from her canteen job, and the

manner in which it was effectuated, was part of the campaign of retaliation against her.

In June of 1999, Heath applied for a vacant lieutenant position and was again passed over. A less senior male applicant got the job. By this time, however, Heath's relationship to her job was in tatters. She had not worked full-time for eight months, and she was plagued by her back problem. Though less senior, the male, Paul Hill, had superior professional qualifications at the time. It was indicative of the atmosphere at the FCSO at the time, however, that it subsequently emerged that, while a C.O., Hill had called the facility's nurse a "cunt" in the presence of other officers and had not been disciplined for the remark.

On August 17, 1999, Heath met with Dr. Mordecai Berkowitz, ("Dr. Berkowitz") an orthopedic surgeon who examined Heath on behalf of the Commonwealth. Dr. Berkowitz opined that Heath had reached a medical end result and should be capable of working full-time. As a result, in the fall of 1999, having been dismissed from the canteen, Heath resumed full-time work as the sergeant on the 7:00 a.m. to 3:00 p.m. shift, a line position.

The campaign of retaliation promptly resumed. In October and November Heath received written reprimands following friction with a subordinate, C.O. Kevin Gamache. Gamache had frequently made derogatory remarks about female correctional staff and about both Heath and co-plaintiff Brissette. Gamache's conduct on both the occasions was as blameworthy as Heath's, but he received no disciplinary action. The reprimands against Heath were pretextual and part of the campaign of retaliation against her.

During these fall weeks, in addition to the unmerited reprimands, Heath was being bombarded with reports about the in- vestigation apparently going on against her. C.O. Courtney Sojka ("Sojka") reported to Heath that he had been chastised by the Sheriff for supporting Heath at an arbitration and instructed to write a negative report about her performance. Officer Wartell also told Heath that he had been instructed to write up anything negative he could about Heath. Officer Brian Tassone ("Tassone") reported to Heath that he was nonplused about why the administration had asked him to write a written report about something as trivial as Heath's lending him a radio battery.

This work environment was having a devastating effect on Heath physically and emotionally. On November 22, 1999, while at work, Heath began experiencing chest pains, accompanied by elevated blood pressure. She was removed from the FCSO by ambulance that day, the last she would work at the facility. Both her nurse practitioner and her psychologist thereafter opined that she could not, consistent with her physical and mental health, continue to work at the FCSO.

Heath was carried as an employee on the records of the FCSO until March of 2000, during which time she did not appear for work. Despite several inquiries by the Sheriff's office, she was not able to suggest any time when she would be able to return. On March 30, 2000, this court denied a portion of a preliminary injunction filed by Heath seeking an order prohibiting the FCSO from formally terminating her. Heath was terminated the next day.

The Sheriff did not find Heath's clinicians' reports regarding her inability to work credible and determined that she should either resume her position or be terminated. Her attendance had been spotty even after her return from light duty. In the whole of 1999, Heath worked only nine days full-time.

The termination caused Heath substantial emotional distress. She has since been able to locate employment, but not with either the salary or benefits of her job at the FCSO.

There are presently three women of rank at the FCSO: Susan Corey, who is a Lieutenant in the DARE Officer position; Lori Streeter, who is a Captain in the Standards and Compliance position, and Laura Boucher, who is Captain in the community service center. As these positions are not "line positions," they are not supervisory in nature.

## 2. *Cynthia Brissette*

In January of 1996, Brissette spoke to then-Superintendent Byron about her long hours without relief on the women's unit. Byron's response was that he had heard they were hiring at the fast-food restaurant, MacDonald's, and perhaps Brissette should submit an application for work there.

As with Heath, male staff at every level were not shy in expressing their derogatory opinions about female staff around Brissette. C.O. Hill said that women should serve at home. Waldron stated that women did not belong, and that he did not want women backing him up in the blocks. Gamache said that women did not belong and that Brissette should be a housewife. Stephan Caloon ("Caloon") constantly made negative remarks about women. Lt. Zewski, C.O. Brown and Captain Brozo in various ways all expressed their opinions, in Brissette's presence, that women could not do corrections work competently.

In December of 1996, mainly for personal reasons, Brissette began treatment with Dr. Ali Moshiri ("Dr. Moshiri"), a psychiatrist. Dr. Moshiri worked in conjunction with Mary Bristol ("Bristol"), a social worker. In December Brissette was prescribed medication for depression and anxiety.

On December 30, 1996, as noted above, Brissette was promoted to the rank of Sergeant, beginning on the 3 p.m. to 11 p.m. shift. The officers under her command included Kevin Brown, Gamache, Hill and Angel Cotto ("Cotto"). When Brissette gave orders, these subordinates often would simply not respond, because she was a female. Frustrated with the lack of response, Brissette sought out Lt. Waldron and Capt. Troczynski for assistance. Neither offered any help. D.S. Byron merely suggested that Brissette work the problem out by speaking to the officers herself. A male officer in a similar situation would have received much more support; the insubordinate correctional officers would have been disciplined.

The lack of support for Brissette as a supervisor was accentuated by her pattern of assignments. She was posted a disproportionate amount of time to units, such as the modular unit, which were located at a distance from the main area, and from which it was more difficult to exercise supervision over the entire shift. Thus, Brissette was often physically as well as emotionally isolated. Her complaints about this were ignored.

On March 5, 1997, Brissette was summoned to the Sheriff's office for questioning with regard to C.O. Gamache's allegations of sexual harassment by Brissette. When she arrived, Attorney Sheridan was there, along with Byron and Hall. Sheridan's manner of questioning was very demeaning and as a result Brissette started to cry. Again, this was part of a pattern of intimidation towards female employees, especially those who had a record of objecting to discrimination.

Acknowledging the lack of support, the court must also find that the evidence regarding Brissette's performance was

mixed. She could be sharp-tongued and inappropriate herself. In April of 1997 she received deserved reprimands for permitting an inmate to release the lock and exit his cell, and for failing to respond properly to inappropriate inmate conduct.

On April 22, 1997, Brissette filed her discrimination complaint with the Massachusetts Commission Against Discrimination ("MCAD"), charging the FCSO with discrimination based on her gender, expressed in part by the failure of the administration to respond to her requests for help with insubordinate officers under her command and by the inappropriate postings.

In the weeks immediately after the filing of the MCAD complaint, Brissette was approached by several inmates, who reported that they had been contacted by senior staff at the FCSO asking for negative information about Brissette. As to one inmate, Kevin Corey, D.S. Sheperd admitted that he was secretly removed from the facility to a private location, where he provided information about Brissette, among other things.

By June 6 of 1997, the focus of Brissette's treatment with Dr. Moshiri began to move from strictly personal issues to the stress at her job; she began using a tranquilizer on a daily basis. On June 11, 1997, Brissette took a leave of absence for two and a half months due to the stress at work. She returned in August, somewhat improved.

On January 14, 1998, Brissette applied for a lieutenant position. The position was eventually awarded to Kevin Brown, who was Brissette's junior. The promotion was awarded to Brown based on his qualifications and not on discrimination against Brissette. However, the discrimination and lack of support suffered by Brissette had handicapped her in acquiring skills and experience that might have made her application stronger.

On September 6, 1998, an incident occurred that led to Brissette's termination. On that day, a Sunday, Brissette was the shift commander and the highest ranking officer in the facility. While making her rounds, C.O. Michelle Roy ("Roy"), a new correctional officer, observed an inmate named Reed using the toilet. Roy told the inmate that he had a small "pee pee." Other inmates overheard the comment and started to laugh at Reed. Roy, perhaps recognizing that she had conducted herself inappropriately, reported what she had done to Sgt. Brissette. Brissette treated the matter as a joke.

Shortly afterwards, another officer called Brissette to inform her that Reed wanted to speak to her and to make a formal complaint against Roy. When Brissette went to Reed's cell, she continued to make light of the matter, even going so far as to suggest jokingly that Reed should let her have a look and make her own judgment about the size of his penis. In the end Reed did not press his complaint or even request a form for reporting his grievance. Brissette felt she had handled the incident properly by de-escalating the situation.

On September 29, 1998, both Roy and Brissette were terminated over the episode. At trial, Brissette testified that the news left her devastated. Although the FCSO may reasonably have concluded that Brissette's handling of this incident was unprofessional, Brissette's termination was a grossly disproportionate sanction for her lapse. No male, and no person who was *not* the target of retaliation, would have been disciplined so harshly.

Following her termination, Brissette filed a grievance and the matter went to arbitration. In an opinion dated August 17, 1999, the arbitrator agreed with the

administration that Brissette was guilty of a significant breach of professionalism but concluded that termination was too severe a penalty. He reduced the sanction to a demotion down to the rank of correctional officer.

After she received notice of her reinstatement, Brissette returned to the FCSO in August of 1999 to sign the necessary paperwork to resume her employment. She was pleased to be getting back to correctional work and felt vindicated by the outcome of the arbitration. When she entered the facility, she followed the normal routine of turning over her keys, in this case to Gamache, the same officer whose behavior towards both Brissette and Heath had been such a problem for them. After she finished filling out the reinstatement papers, Brissette returned to find that her keys had been taped together so tightly by Gamache that she could not use them. Officers nearby apologized and assisted Brissette in cutting open the bundle of tape.

When Brissette saw her keys, she felt that the harassment was starting all over again and became very upset. She reported the matter to her superiors and was instructed to write a report. After consulting with her following this incident, Dr. Moshiri stated that he did not feel that his patient could return to work at the FCSO and drafted a letter to this effect.

On January 4, 2000, Brissette received a letter of termination from the FCSO, based on her failure to report for work following the arbitration ruling.

Brissette found the termination very hard emotionally. She had expected to make a career in corrections. Nevertheless after a few months of unemployment she located a new job, where she is doing well, although the salary is not as good.

The court cannot conclude that the childish act of taping Brissette's keys together was enough to justify Brissette's decision to forego further employment with the FCSO. The evidence was strong that supervisors at the facility were willing to take her back, were polite to her and would have been supportive. Although the excessive harshness of her initial termination was clearly discriminatory, the evidence of misconduct by the employees of the Sheriff's office following Brissette's successful arbitration and reinstatement was insufficient to support a claim for wrongful termination.

### 3. *Additional Facts*

On March 18, 1999, Sheriff Macdonald made comments to Frank Gentile, the Union president, within the hearing of both Lt. Hunter, who was a union steward at the time, and the plaintiff Susan Heath. All three witnesses credibly confirmed that the comments concerned the complaints of Heath, Brissette and Fairbrother for gender-based discrimination. Gentile was remonstrating with Macdonald about what he perceived to be the FCSO's retaliation against the three women, especially Brissette's termination, which Gentile felt was unwarranted. Gentile informed the Sheriff that, under the same circumstances, anyone else would have been disciplined, at most, not terminated. In reply the Sheriff said, in essence: "What am I supposed to do? The three of them are trying to take away my livelihood, my house, my child's education." Although Macdonald's comment may, in the abstract, be subject to various interpretations, the court finds, in the context of the evidence as a whole, that the remark expressed the Sheriff's personal frustration at the plaintiffs' decision to seek redress for discrimination through legal complaints against him, his staff and the FCSO. His words constitute one especially significant chip in a mosaic of evi-

dence that vividly depicts the defendant's retaliatory animus against the plaintiffs for their complaints.

Beyond the outburst by the Sheriff, both Hunter and Gentile credibly confirmed from their perspectives within the union that Heath and Brissette were, in general, far more likely to be investigated and disciplined than other officers, especially after they began supporting Fairbrother and filing their own complaints.

Looking at the period as a whole, during the latter years of their employment the plaintiffs continued to suffer lack of support and disparagement at the FCSO, based on their gender. This hostile atmosphere flowed without interruption back into the "Dark Age" of the McQuade era. While the environment improved somewhat, and officers got the message that the grosser forms of behavior could lead to discipline, the plaintiffs still suffered greatly from the effects of this discrimination. More importantly, perhaps, the plaintiffs individually found themselves to be the target of a coordinated campaign of retaliation, based not only on their gender, but on the fact that they had instituted formal proceedings complaining about their treatment.

## III. CONCLUSIONS OF LAW

At the conclusion of the trial plaintiffs sought relief on ten of the twelve counts originally offered in their complaint; the two other counts were dismissed at or before trial. Viewed in the context of the evidence as a whole, however, these ten counts may fairly be analyzed as three distinct theories of recovery: (1) hostile work environment; (2) disparate treatment, and (3) retaliation.

As will be seen below, even this theoretical structure may be further simplified. The disparate treatment theory overlaps, to some extent, with the claims for hostile

environment and retaliation and would provide an independent ground for an award of damages (on the facts of this case) only to the extent that plaintiffs proved that defendants failed to promote, or terminated, them based on their gender. Since the court will find for defendant on the claims for failure to promote and termination, plaintiffs will receive a full award of damages, under all counts upon which they have prevailed, under the hostile environment and retaliation theories. Thus, to make the analysis clear, the court will decline to weigh the facts count by count, but will begin with the plaintiffs' hostile environment cause of action, then move to the disparate treatment theory and finally address the retaliation claim.

### A. Hostile Work Environment.

This discussion will address, first, the standards applicable to a federal claim charging maintenance of a hostile environment and then the analogous standards under state law.

#### 1. Hostile Work Environment under Title VII

The Supreme Court has stated that Title VII is violated, "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment . . .'" Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal citations omitted), quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65 & 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). In discussing when conduct is "sufficiently severe or pervasive," the First Circuit emphasized that "[n]ot all offensive conduct is actionable as harassment; trivial offenses do not suffice." DeNovellis v. Shalala, 124 F.3d 298,

310 (1st Cir.1997). As the Supreme Court stated in *Harris,* the "sexually objectionable environment must be both objectively and subjectively offensive" for conduct to rise to the level of actionable sexual harassment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), *citing Harris,* 510 U.S. at 21–22, 114 S.Ct. 367. The pervasiveness and severity of the conduct is determined by looking at all of the circumstances, which include the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 787–788, 118 S.Ct. 2275, *quoting Harris,* 510 U.S. at 23, 114 S.Ct. 367.

■ To prevail on a hostile environment claim arising from gender-based discrimination, a plaintiff must show the following: (1) that she is a member of a protected class;; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established. *O'Rourke v. City of Providence,* 235 F.3d 713, 728 (1st Cir.2001), *citing Faragher,* 524 U.S. at 787–789, 118 S.Ct. 2275.

■ The First Circuit noted in *O'Rourke* that

where a plaintiff endures harassing conduct, although not explicitly sexual in nature, which undermines her ability to succeed at her job, those acts should be considered along with overtly sexual conduct in assessing a hostile work environment claim.

235 F.3d at 729. Moreover, "[c]ourts should avoid disaggregating a hostile work environment claim, dividing conduct into instances of sexually oriented conduct and instances of unequal treatment, then discounting the latter category of conduct." *Id.* at 730.

2. *Hostile Work Environment Under Mass. Gen. Laws ch. 151B*

The approach taken by the Supreme Judicial Court to "hostile environment" claims brought under the state statute does not differ greatly from the Supreme Court's analysis.

According to the Supreme Judicial Court, "[a] hostile work environment is one that is 'pervaded by harassment and abuse, with the resulting intimidation, humiliation, and stigmatization, [and that] poses formidable barriers to the full participation of an individual in the workplace.'" *Cuddyer v. Stop & Shop Supermarket Co.,* 434 Mass. 521, 532, 750 N.E.2d 928 (2001), *quoting College–Town Div. of Interco, Inc. v. Massachusetts Comm'n Against Discrimination,* 400 Mass. 156, 162, 508 N.E.2d 587 (1987).

For purposes of a hostile environment claim under chapter 151B, sexual harassment is defined in part as "verbal or physical conduct of a sexual nature ... [that] has the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment." Mass. Gen. Laws ch. 151B, § 1(18)(b).

■ In weighing the evidence of hostile work environment, courts must consider the environment as a whole. Thus, "acts of sexual harassment directed against oth-

ers that were known to the plaintiff, and the defendant's failure to discipline anyone for the acts, or effectively to remedy them, may be considered part of the environment in which the plaintiff[s] worked." *Cuddyer*, 434 Mass. at 541, 750 N.E.2d 928.

### 3. *Statute of Limitations*

Brissette filed her MCAD and EEOC complaints on April 22, 1997, and Heath filed hers on May 31, 1997. Heath seeks to recover for conduct that occurred from 1988 through 1997 and Brissette seeks to recover for conduct that occurred from 1990 through 1997. Because plaintiffs charge defendants with discriminatory conduct reaching back many years, and because defendants contend that many of the plaintiffs' claims are untimely, it is necessary as a preliminary matter to address the applicable limitations period in this case.

According to Mass. Gen. Laws Ann. ch. 151B, § 5, an MCAD complaint must be filed "within six months after the alleged act of discrimination." However, an exception exists where the conduct is of a "continuing" nature. *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 529 n. 7, 750 N.E.2d 928 (2001).

Under Title VII, an employment discrimination charge that is first filed with MCAD must then be filed with the EEOC within three hundred days of the discrimination alleged. *See Provencher v. CVS Pharmacy*, 145 F.3d 5, 13 (1st Cir.1998); *see also* 42 U.S.C.A. § 2000e–5(e). Like its state law counterpart, Title VII permits an equitable exception to this rule when the conduct is deemed to be ongoing in nature. This exception allows an employee to "recover for events outside the 300–day limitations period 'if they are deemed part of an ongoing series of discriminatory acts and there is some violation within the statute of limitations period that anchors

the earlier claims.'" *Marrero v. Goya of Puerto Rico*, 304 F.3d 7, 17 (1st Cir.2002), *quoting O'Rourke v. City of Providence*, 235 F.3d 713, 730 (1st Cir.2001).

Up until recently, decisional authority drew a distinction between two types of continuing violations: serial and systemic. A serial violation comprised " 'a number of discriminatory acts emanating from the same discriminatory animus, each of which constitutes a separate wrong actionable under Title VII.'" *Megwinoff v. Banco Bilbao Vizcaya*, 233 F.3d 73, 74 (1st Cir. 2000), *quoting Pilgrim v. Trustees of Tufts College*, 118 F.3d 864, 869 (1st Cir.1997). To avoid dismissal of untimely claims under this theory, a plaintiff was obliged to point to discriminatory acts that occurred within the limitations period and link this conduct to earlier discriminatory behavior. *Id.*, *citing Provencher v. CVS Pharmacy*, 145 F.3d 5, 14 (1st Cir.1998).

A systemic violation was rooted in a particular discriminatory policy or practice, such as hiring, promotion, training and compensation. *Provencher*, 145 F.3d at 14. " '[S]o long as the policy or practice itself continues into the limitations period, a challenger is deemed to have filed a timely complaint.'" *Id.*, *quoting Sabree v. United Broth. of Carpenters and Joiners Local No. 33*, 921 F.2d 396, 400 n. 7 (1st Cir.1990). With this species of continuing violation, plaintiffs were not required to identify a discriminatory act that occurred within the limitations period. *Id.*, *citing Muniz–Cabrero v. Ruiz*, 23 F.3d 607, 610 (1st Cir.1994).

The First Circuit has recently recognized that in light of the Supreme Court's *Morgan* decision (discussed below) "it is no longer necessary for a [factfinder] to determine whether a violation is systemic or serial. . . ." *Crowley v. L.L. Bean*, 303 F.3d 387, 406 (1st Cir.2002). The trial court must simply address the question: "[I]s

the *subject matter* of the discriminatory acts sufficiently similar that there is a substantial relationship between the otherwise untimely acts and the timely acts?" And, then make the inquiry: "[A]re the acts isolated and discrete or do they occur with *frequency* or repetitively or continuously?" *O'Rourke v. City of Providence*, 235 F.3d 713, 731 (1st Cir.2001) (emphasis in original).[6]

This analytic approach has been illuminated by the Supreme Court's recent decision in *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002), a case very similar to this one. In *Morgan*, the plaintiff, an African–American railroad employee, brought suit against Amtrak charging both discrete discriminatory acts *and* a racially hostile work environment that had prevailed throughout the many years of his employment. The district court granted summary judgment for Amtrak, on both claims, with regard to any conduct by Amtrak occurring outside the applicable 300–day limitation period. The Ninth Circuit reversed, holding that a plaintiff could base his suit both on discrete acts of discrimination and a racially hostile environment, and reach back before the 300–day limitation period, provided that the earlier conduct was "sufficiently related" to incidents that fell within the limitation period. *Id.*, 122 S.Ct. at 2068.

Justice Thomas' majority opinion in *Morgan*, affirming the Ninth Circuit in part, drew a distinction between claims for discrete acts of discrimination and claims for a hostile environment. For discrete acts, such as failure to promote, the statutory limitation period was strict; suits based upon acts outside the limitation period would be barred. *See, Marrero* at 18.

For a hostile environment claim, however, consideration of "behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as any act contributing to that hostile environment takes place within the statutory time period." *Morgan* at 2068.

■ The independent analysis of a hostile environment claim, the *Morgan* opinion makes clear, is rooted in the distinct nature of the claim itself. This kind of unlawful employment practice "cannot be said to occur on any particular day." *Id.*, at 2073. Rather, "[i]t occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* Although it may comprise a series of separate acts, a hostile environment claim constitutes *one* unlawful employment practice. *Id.*, at 2074. Thus, if any portion of the conduct that collectively expresses the hostile environment takes place during the limitations period, the defendant may be liable for that unlawful employment practice as a whole, including the elements of it that extend back many years before the limitations period.

■ In weighing the viability of a hostile environment claim, moreover, the Court held that trial judges need not—as some circuits had required before *Morgan*—inquire into whether the employer's misconduct had become so manifest that it would have been reasonable to expect the plaintiff to bring suit earlier. As the First Circuit noted in *Marrero*, this aspect of *Morgan* analysis rendered moot the third point of analysis enunciated in its earlier *O'Rourke* opinion. *See* n. 6, above. Questions regarding the subject matter and frequency of the discriminatory conduct

---

**6.** A third question noted in *O'Rourke* ("[A]re the acts of sufficient permanence that they should trigger an awareness of the need to assert one's right") is no longer pertinent following the Supreme Court's *Morgan* decision.

now constitute the central focus. In a hostile environment case, a spectrum of discriminatory conduct, occurring over a span of time, will be actionable when, for example, "the pre- and post-limitations period incidents involve the same type of employment actions, occurred relatively frequently and were perpetrated by the same managers." *Morgan*, at 2076, quoting the lower court opinion, 232 F.3d at 1017.

The Massachusetts Supreme Judicial Court's decision in *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 750 N.E.2d 928 (2001), established a generous approach to the statute of limitations in hostile environment cases under Mass. Gen. L. ch. 151B. Justice Greaney's opinion presaged the Supreme Court's *Morgan* decision, noting that "sexual discrimination based on a hostile work environment is a unitary cause of action based on the cumulative effect of hostile acts over the course of time . . . ." *Id.*, at 533, 750 N.E.2d 928. Where at least one incident occurs during the limitation period, which "substantially relates" to earlier incidents of abuse and "substantially contributes" to the hostile environment, then "that incident anchors all related incidents, thereby making the entirety of the claim for discriminatory conduct timely." *Id.*

■ Under the SJC's approach, a plaintiff will be barred under state law only when she "knew or reasonably should have known that her work situation was pervasively hostile *and unlikely to improve*, and, thus, a reasonable person in her position would have filed a complaint with the MCAD before the statute ran on that conduct." *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 539, 750 N.E.2d 928 (2001) (emphasis added). This state law test focuses on "the plaintiff's knowledge of the hopelessness of her work environment, and allows her to litigate alleged,

otherwise time-barred, acts of sexual harassment unless her delay in initiating the lawsuit, considered under an objective standard, was unreasonable." *Id.* at 540, 750 N.E.2d 928.

Under federal law, there can be no doubt that this court's examination of the plaintiffs' hostile environment claim must extend over the entire period of the alleged discrimination. Any other approach would fly in the teeth of *Morgan*. Defendants do not dispute that specific acts of harassment are charged well within the limitation period. Nor can they dispute that earlier alleged acts were of the same general tenor and allegedly occurred with frequency and regularity. As in *Morgan*, plaintiffs accuse the defendants of maintaining a consistently hostile environment, composed of a generally uniform and more or less constant pattern of harassment, with the same types of employment actions perpetrated by the same managers over many years.

This court's conclusion regarding the federal claims eliminates any question about the timeliness of plaintiffs' hostile environment claims under state law as well, except for one additional issue. As noted above, the court in assessing the timeliness of the ch. 151B claim must also inquire whether the plaintiff "knew or reasonably should have known that her work situation was pervasively hostile and unlikely to improve . . . [so that] a reasonable person in her position would have filed a complaint with the MCAD before the statute ran on that conduct." *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 539, 750 N.E.2d 928 (2001).

Given the rather ambiguous environment at the FCSO during the relevant time period, plaintiffs could not fairly be said to have been on notice of the "hopelessness" of their situation before the spring of 1997. It is undisputed that, even

within the generally hostile environment, some positive changes were beginning to take place. Gender neutral assignments were implemented, and some women did receive promotions. It was not until 1997 that the environment reached a point of what might objectively be described as "hopeless." *See Cuddyer*, 434 Mass. at 540, 750 N.E.2d 928. In light of this, the court's assessment of the plaintiffs' state law hostile environment claims, along with the federal claims, will include the entire time period described above in the summary of facts.

■ As a final matter, it is important to note that in a case like this it is appropriate to consider acts occurring *after* the filing of a discrimination charge. Later retaliatory conduct may be considered where it is "reasonably related to and grows out of the discrimination complained of to the agency—*e.g.*, the retaliation is for filing the agency complaint itself." *Clockedile v. New Hampshire Department of Corrections*, 245 F.3d 1,6 (1st Cir.2001).

### 4. *Analysis*

■ Given the court's lengthy findings of fact, it will not be necessary to recapitulate in detail the evidence that clearly establishes the existence of a work environment hostile to female correctional officers at the FCSO. The facts are more than sufficient to establish by a preponderance of the evidence the elements of this claim. Obviously, the plaintiffs, as women, are members of the protected class. Moreover, they were subjected to unwelcome sexual harassment, based on their gender. This harassment included the following: (1) a stream of epithets directed at, or about, women ("cunt," "douche bag," "crotchburn," "birdbrain," "FMH"—for "fuck me hard"—and the like); (2) constant deprecation of the professional abilities of female correctional staff, and particularly harsh and nearly uniform expressions of contempt for women attempting to work in "line" positions; (3) regular and unchecked insubordination by male officers towards women of rank, including derisive saluting; (4) failure to support women reporting problems with subordinates; (5) inconsistent and often half-hearted efforts to investigate and remedy instances of sexual harassment; (6) assignment patterns designed to undermine women as supervisors, and (7) excessively aggressive scrutiny and inordinately harsh discipline of female correctional officers (especially women applying for promotion, or protesting discrimination).

The atmosphere of hostility to women correctional officers altered the plaintiffs' conditions of employment by creating an abusive work environment. This toxic atmosphere undermined the ability of female officers to do their jobs effectively and caused the plaintiffs, in particular, severe emotional damage. The plaintiffs reasonably viewed their work environment as abusive and often dreaded going to work, eventually becoming physically ill as a result. Any reasonable person in their positions would have reacted the same way. This evidentiary profile traces all the constituents noted by Justice Thomas in *Morgan*. The misconduct was frequent, severe and humiliating; it "unreasonably interfered with ... [the plaintiffs'] work performance." *Morgan*, at 2074.

These conclusions of law cover all the elements of a claim for hostile environment under both the federal and state statutes, except the final element, which is that "some basis for employer liability" be established. *O'Rourke*, 235 F.3d at 728.

■ The proof of employer liability will vary depending on whether the harassment came from a supervisor or co-employee. If the harassment was caused by

a co-employee, then "the employer is liable if it 'knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action.' " *White v. New Hampshire Department of Corrections*, 221 F.3d 254, 261 (1st Cir.2000) (citation omitted). In contrast, if the harasser was a supervisor, then:

> the employer is liable unless it proves the affirmative defense 'that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and ... that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise'.

*White*, 221 F.3d at 261, quoting *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275.

In this case the hostile environment was fostered and promoted by subordinates, peers and superiors. With regard to the misconduct by the plaintiffs' subordinates and co-employees, the FCSO undoubtedly knew, or certainly should have known, of the unlawful conduct; the action it took was neither prompt nor appropriate. With regard to the actionable behavior of supervisors, the FCSO did not demonstrate that it took reasonable care to prevent and correct the behavior. Moreover, the evidence clearly demonstrated that plaintiffs did attempt to use avenues of relief available to them, but the defendants actively resisted and thwarted these efforts.

For the foregoing reasons, this court finds that the defendants subjected the plaintiffs to a hostile work environment in violation of state and federal law and, as a result, are liable to the plaintiffs for damages. Judgment will therefore enter for the plaintiffs on Counts III, IV, VII, VIII and IX.

### B. *Disparate Treatment*

Under federal law, cases of disparate treatment are analyzed under the burden shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). This framework was adopted by the Massachusetts courts in *Wheelock College v. Massachusetts Comm'n Against Discrimination*, 371 Mass. 130, 355 N.E.2d 309 (1976). *Lipchitz v. Raytheon Co.*, 434 Mass. 493, 498, 751 N.E.2d 360 (2001); *see also White v. University of Massachusetts at Boston*, 410 Mass. 553, 557, 574 N.E.2d 356 (1991).

The *McDonnell Douglas* analysis has three stages. In the first stage, the plaintiff must establish a *prima facie* case of employment discrimination. *Dichner v. Liberty Travel*, 141 F.3d 24, 29–30 (1st Cir.1998). This can be accomplished "by demonstrating that she is a member of a protected group who has been denied an employment opportunity for which she was otherwise qualified." *Id.* Establishment of the *prima facie* case "gives rise to a rebuttable presumption that the employer unlawfully discriminated against the Title VII plaintiff." *Byrd v. Ronayne*, 61 F.3d 1026, 1031 (1st Cir.1995).

In the second stage, the employer is provided with an opportunity to rebut this presumption. This is accomplished by producing sufficient competent evidence to permit a rational fact finder to conclude that there was a nondiscriminatory reason for the challenged employment action. *Byrd*, 61 F.3d at 1031, *quoting Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1091 (1st Cir.1995); *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 56 (1st Cir.1999).

At the last stage of the analysis, the plaintiff "must prove by a preponderance of the evidence each essential element in a *prima facie* case and that the employer's justification for the challenged employment action was merely a pretext for im-

permissible ... discrimination." *Byrd*, 61 F.3d at 1031.

Heath and Brissette argue that they were subjected to disparate treatment based on their gender on various grounds. They point, for example, to the FCSO's frequent investigations and disciplinary actions and to the discriminatory distribution of post assignments. As noted in the introduction to this memorandum, it is not necessary to address these claims, since plaintiffs will receive a full award of damages for any misconduct on the part of the defendants in these areas through the court's verdict in their favor on the counts for hostile environment and retaliation.

 In two areas, however, plaintiffs claim they suffered discriminatory treatment for which they would be entitled to an award of damages independent of, and in addition to, their claims for hostile environment and for retaliation. They both charge that they were denied promotions and ultimately terminated because of the defendants' bias against them as women.

With regard to the promotions, it is important to emphasize that both the plaintiffs did, in fact, receive promotions to the rank of sergeant. In the instances where the defendants declined to promote them, the defendants offered legitimate, non-discriminatory reasons, based on both the superior qualifications of the candidates eventually promoted and on objective concerns about the plaintiffs' readiness for heavier responsibilities. Even where plaintiffs may have had technical seniority, substantial evidence of these independent, legitimate considerations supported the defendants' pro-

motional decisions. The defendants' proffered non-discriminatory justifications were not persuasively rebutted, and plaintiffs failed to carry their ultimate burden of demonstrating that the promotional decisions reflected gender-based discriminatory animus.

Admittedly, the court's conclusion regarding the promotion decisions takes a different tack from its determination regarding the powerful evidence of a hostile environment. These different determinations, however, reflect the nuances of a complex situation. On the rather unusual facts of this case, the hostile environment, though pervasive, simply did not have a determinative impact on the promotion decisions regarding the plaintiffs. To put it differently, even in an environment without a trace of discriminatory animus against women, the plaintiffs, for legitimate objective reasons, would not have received the promotions they claim were wrongfully withheld from them.[7]

The termination picture is slightly more complex, but the conclusion is the same.

At the time of Susan Heath's termination in March of 2000 she had been absent from work for four months and had worked only nine full days in the entire year of 1999. She was unable to give any indication of when she might be able to return to work, even part-time, and did not provide adequate medical documentation to support her continued absence. Similarly, Cynthia Brissette, at the time of her termination in January of 2000, had also been away from work for four months and had been unable, or declined, to estimate when she might return to work.[8] Defen-

---

7. Having concluded that the promotion decisions were not proved to be discriminatory, the court must note that the plaintiffs' claims were certainly substantial and, indeed, sufficiently supported to survive summary judgment. Moreover, the continued absence of

*any* women of rank in line positions, over many years now, is troubling and may, if it continues, provide grounds for future litigation.

8. Brissette's earlier termination for misconduct as a supervisor in the "Reed" incident

dants proffered the plaintiffs' long absences from work as the basis for their termination decisions. This gender-neutral justification for the defendants' action was not persuasively rebutted.

Brissette and Heath argued that the terminations were discriminatory because male sick leave abusers were never fired. However, no evidence suggests that other sick leave abusers, of either gender, were absent from work for anything approaching the length of time plaintiffs were out, or with no expressed intention of returning. It is obvious, and well established in the law, that regular attendance on the job constitutes an essential requirement for employment. *See Leary v. Dalton*, 58 F.3d 748, 753 (1st Cir.1995) (finding in a case under the ADA that an "essential function" of employment was showing up for work as scheduled); *Garcia–Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638, 650 (1st Cir.2000) (finding within the context of an ADA claim that an employee's absence from work with no indication of when return was likely was relevant in deciding whether a request for leave of absence was unreasonable); *Rogers v. International Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir.1996), *quoting Carr v. Reno*, 23 F.3d 525, 530 (D.C.Cir.1994) (noting that several courts have recognized that " 'an essential function of any . . . job is an ability to appear for work . . .' ").

In these circumstances, on the question of wrongful termination, this court must conclude that the plaintiffs have failed to meet their burden of showing that the proffered reason for the defendants' action was a pretext for unlawful discrimination. Plaintiffs' gender played no significant part in the defendants' termination decision.

■ On this issue of termination it is important to underline, finally, that the plaintiffs have neither pled nor argued that they suffered a "constructive discharge." This occurs when the conditions of employment are "so difficult or unpleasant that a reasonable person . . . would have felt compelled to resign." *Marrero v. Goya of Puerto Rico*, 304 F.3d 7, 28 (1st Cir.2002), citing *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir.1977). Plaintiffs in this case never resigned, nor have they argued that "staying on the job while seeking redress" was intolerable. *Id.*, citing *Keeler v. Putnam Fid. Trust*, 238 F.3d 5, 10 (1st Cir.2001). Monetary damages for wrongful termination may not therefore be awarded on any theory of constructive discharge.

### C. Retaliation

Under Title VII, it is unlawful for an employer to retaliate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C.A. § 2000e–3(a). Likewise, under Massachusetts law, it is unlawful to "discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified, or assisted in any proceeding under section five." Mass. Gen. Laws Ann. ch. 151B, § 4.

■ In both contexts, the plaintiff has the burden to establish a *prima facie* case from which retaliatory motive can be inferred. *Hazel v. U.S. Postmaster Gener-*

---

was improper, and its excessiveness did reflect gender-based discrimination as well as retaliation. However, as noted, this termi-

nation was reduced on appeal to a demotion, and plaintiff was reinstated and received full compensation for lost wages.

*al,* 7 F.3d 1, 3 (1st Cir.1993). The plaintiff can meet this burden by showing: "(1) she engaged in protected conduct, (2) she suffered an adverse employment action, and (3) a causal connection existed between the protected conduct and the adverse action." *Flanagan–Uusitalo v. D.T. Industries, Inc.,* 190 F.Supp.2d 105, 116 (D.Mass. 2001), *citing McMillan v. Mass. Soc. for Prev. of Cruelty to Animals,* 140 F.3d 288, 309 (1st Cir.1998). In order to prove causation, the plaintiff must demonstrate at a minimum that "the alleged retaliators knew of the plaintiff's protected activity and that a retaliatory motive played a part in the adverse employment actions alleged." *Lewis v. Gillette, Co.,* 22 F.3d 22, 24 (1st Cir.1994).

After the plaintiff has proved her *prima facie* case, the burden shifts to the defendants "to articulate a plausible, legitimate, and nondiscriminatory justification for the employment decision." *Hazel v. U.S. Postmaster General,* 7 F.3d at 3.

Once the employer has articulated his reason, the trier of fact must decide the ultimate question. If the articulated reason is rejected, the ultimate fact may be inferred. *Id.* at 3, *quoting St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The burden of persuasion is upon the plaintiff at all times. *Id.*

■ The evidence of deliberate retaliation against the plaintiffs for their formal and informal complaints about discrimination is overwhelming. Once they were identified as "complainers," the plaintiffs were singled out for constant hyper-scrutiny of their work, trumped up and sometimes secret investigations, aggressive questioning deliberately designed to intimidate them, inordinate and inappropriate discipline and chronic lack of support in a dangerous and stressful environment. This course of behavior was intentionally designed to cow the plaintiffs, punish them for their legitimate complaints and deter others from objecting to the hostile environment prevailing at the FCSO. Susan Heath had virtually no record of discipline before she filed her complaint. The harassment that followed, including the badgering, the humiliating referral to the training academy and her removal from her post in the canteen, affected her physically and ultimately led to her removal from the facility by ambulance. Cynthia Brissette, as well, suffered significant medical symptoms. In addition, she suffered a preliminary termination, later reduced to a demotion, that, as a sanction for misconduct was out of all proportion to the magnitude of her professional lapse. No male would have been terminated as she initially was, or been required to go through the appeals process to recover his job as she eventually did.

The evidence demonstrates by much more than a mere preponderance that plaintiffs engaged in protected conduct and suffered repeatedly from adverse employment actions as a result. The defendants, of course, knew of the protected conduct and were motivated by this conduct to retaliate—as the Sheriff, essentially, admitted in the statements credibly reported by Hunter and Gentile.

No credible, legitimate justification for the defendants' actions has been articulated. While it is undoubtedly true that discipline and strict oversight are important in a correctional setting, the defendants' actions went far beyond what was necessary to insure the orderly operation of the facility and the security of the inmates, the staff and the public.

In view of this, the court will enter judgment for the plaintiffs on Counts V, X and XI.

## D. *Damages*

Given the court's conclusion that the plaintiffs suffered no improper termination, no lost wages or "front pay" will be awarded. In view of the very significant emotional distress suffered by the plaintiffs, however, the court will award each plaintiff $150,000 in compensatory damages. The emotional damage suffered by the plaintiffs was substantial, and the invisible, but nonetheless painful, scars caused by their treatment at the hands of the defendant were still evident even at the time of trial.

Moreover, the evidence demonstrates that Susan Heath paid $10,000, and Cynthia Brissette $5,000, in medical costs attributable to the harassment inflicted on them as a result of the hostile environment and retaliation. Pre-judgment interest will be added to the awards for medical costs, but not for the compensatory damages for emotional distress.

The court will award punitive damages also. Exemplary damages of this sort can be awarded if "a plaintiff demonstrates that her employer 'engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.'" *Marcano–Rivera v. Pueblo International, Inc.*, 232 F.3d 245, 253 (1st Cir.2000), *citing* 42 U.S.C. § 1981a(b)(1). If the case had involved merely the hostile environment, the evidence of this extra level of culpability would probably not have been sufficient to justify an award. With regard to the retaliation claim, however, the evidence of a deliberate, vindictive and malicious desire to punish the plaintiffs—to actually injure them emotionally—for asserting their rights makes an award of punitive damages appropriate. For this reason, the court will award each plaintiff an additional $20,000 in punitive damages.

In view of the magnitude of the damage award, and the indications of improvement in the treatment of female staff at the FCSO, the court will exercise its discretion to deny any injunctive relief. *But see,* n. 7, *supra.* This case has not been filed or certified as a class action, and injunctive relief running to the benefit of third parties (as plaintiffs have requested) would not be appropriate here. *See, Brown v. Trustees of Boston University*, 891 F.2d 337, 361 (1st Cir.1989).

Finally, plaintiffs are entitled to a full award of reasonable attorneys' fees. Counsel's application may be submitted in accordance with the applicable rules.

## IV. *CONCLUSION*

In summary, this court finds that the FCSO unlawfully retaliated against the plaintiffs and subjected them to a hostile work environment in violation of Title VII and Mass. Gen. Laws ch. 151B. Hence, Judgment will enter for plaintiffs on Counts III, IV, V, VII, VIII, IX, X and XI of the Amended Complaint. Judgment will enter for defendants on all remaining counts.

Pursuant to this judgment, the court will award plaintiff Susan Heath damages in the amount of $180,000 ($150,000 for emotional distress, $10,000 for medical costs, and $20,000 in punitive damages). To Cynthia Brissette, the court will award $175,000 ($150,000 for emotional distress, $5,000 for medical costs, and $20,000 in punitive damages). Pre-judgment interest will be awarded only on the award for medical costs.

A separate Order will issue.

## *ORDER*

For the reasons stated in the accompanying Memorandum, this court finds that

the FCSO unlawfully retaliated against the plaintiffs and subjected them to a hostile work environment in violation of Title VII and Mass. Gen. Laws ch. 151B. Hence, Judgment will enter for plaintiffs Cynthia Brissette and Susan Heath on Counts III, IV, V, VIII, IX, X and XI of the Amended Complaint. Judgment will enter for defendants on all remaining counts.

Pursuant to this judgment, the court will award plaintiff Susan Heath damages in the amount of $180,000 ($150,000 for emotional distress, $10,000 for medical costs, and $20,000 in punitive damages). To Cynthia Brissette, the court will award $175,000 ($150,000 for emotional distress, $5,000 for medical costs, and $20,000 in punitive damages). Pre-judgment interest will be awarded only on the award for medical costs.

It is So Ordered.